## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HOSPIRA, INC.,

       *Plaintiff,*

and

SANDOZ, INC.,

       *Intervenor-Plaintiff*

       v.

SYLVIA MATHEWS BURWELL,
Secretary of Health and Human Services,

MARGARET A. HAMBURG, M.D.,
Commissioner of Food and Drugs,

and

UNITED STATES FOOD AND DRUG
ADMINISTRATION,

       *Defendants,*

PAR STERILE PRODUCTS, LLC,

       *Intervenor-Defendant,*

MYLAN INSTITUTIONAL LLC,

       *Intervenor-Defendant.*

Case No. 8:14-cv-02662-GJH

PUBLIC VERSION

## DECLARATION OF TONY PERA
## IN SUPPORT OF PAR STERILE PRODUCTS, LLC'S
## MOTION FOR RECONSIDERATION OF THE TEMPORARY RESTRAINING ORDER

I, Tony Pera, declare the following:

1.　　I am the Chief Commercial Officer at Par Pharmaceutical, Inc., located in Spring Valley New York.  I previously worked at JHP Pharmaceuticals, LLC ("JHP"), where I served as the Senior Vice President of Commercial Operations, and joined Par following Par's acquisition of JHP in February 2014.  At Par, I am responsible for sales, marketing, contracts, and customer service for both the oral and injectable business.  The injectable business operates as Par Sterile Products, LLC ("Par"), a wholly owned subsidiary of Par.

2.　　I have personal knowledge of the facts set forth herein.  I submit this declaration in support of Par's motion for reconsideration of the temporary restraining order issued by this Court on August 19, 2014.

3.　　On February 2, 2012, Par submitted its ANDA seeking FDA approval to market and sell dexmedetomidine hydrochloride injection, 100 mcg (base)/mL, packaged in 200 mcg (base)/ 2 mL single-dose vials ("Par's product"), *i.e.*, Par's generic version of Plaintiff Hospira Inc.'s ("Hospira") Precedex® pharmaceutical product.

4.　　In September 2013, Par began manufacturing batches of its generic product in anticipation of the FDA's approval of its ANDA.  Par had filed a paragraph PIII certification for U.S. Patent No. 4,910,214 ("the '214 patent"), which was set to expire on January 15, 2014.  Because this was the only impediment to FDA approval of Par's ANDA, Par expected to obtain FDA approval on January 15, 2014, the day of the expiration of the '214 patent.

5.　　I understand that on January 15, 2014, instead of approving Par's product, the FDA requested comments from Par on whether its Section viii statement was still proper in view of a modification made by Hospira regarding its patent use code in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") for U.S. Patent U.S. Patent No.

2

6,716,867 ("the '867 patent").  A true and correct copy of the FDA's January 15, 2014 letter is attached as Exhibit 1.

6.      Par provided the FDA with comments explaining why its product should be approved, and why Hospira's conduct in manipulating the patent use code for its '867 patent was improper.  A true and correct copy of Par's comments dated January 24, 2014, to the FDA (without the supporting exhibits) is attached as Exhibit 2.  On January 31, 2014, Par provided additional comments, and a true and correct copy of these additional comments is attached as Exhibit 3.

7.      Even though Par had manufactured batches of its product in anticipation of FDA approval, FDA approval was delayed by Hospira's conduct in manipulating the use codes of its patent.  Finally, on August 18, 2014, the FDA approved Par's ANDA to market its product.  The following day, on August 19, 2014, Par began selling its product to wholesalers.

8.      When Par received notice of this Court's temporary restraining order on the evening of August 19, 2014, Par stopped selling its product.

9.      On August 20, 2014, Par received a letter from the FDA notifying it that pursuant to the Court's temporary restraining order, the FDA's approval of Par's product has been stayed.  Attached hereto as Exhibit 4 is a true and correct copy of a letter Par received from the FDA on August 20, 2014.

10.     The FDA's suspension of its approval for Par's product is already hurting Par.  In just one day, Par had to turn away two customers, ███ ██ ██████.  Other customers have already contacted Par out of concern over Hospira's legal proceedings.  Every day Par's approved product is kept off the market costs Par substantial sums of money.

11.     As a first entrant in the generic market, Par should be entitled to advantages, including the ability to establish contracts and relationships that persist even after its formal first-entrant advantage fades. Other generics, including Akorn and Caraco, are standing in wait. A true and correct copy of the FDA's webpage showing the marketing status of generic versions of dexmedetomidine hydrochloride is attached as Exhibit 5. Akron and Caraco each has tentative FDA approval for their generic products. If Par's FDA approval is delayed, Par will lose its advantage of being one of the first approved generic products.

12.     By being one of the first generic products on the market, Par would be able to gain a significant customer base and leverage long-term contracts. If FDA's final approval of Par's ANDA continues to be suspended, or ultimately rescinded, Par expects to lose existing contracts with large purchasers and other first-to-market advantages, including the opportunity to supply major customers with other, non-exclusive products. Par's customers will also be harmed because they will be forced to purchase Precedex at Hospira's inflated, monopolistic prices.

13.     The recall of Par's products would financially devastate the company. As soon as the FDA approved Par's product on August 18, 2014, Par shipped its product. On August 19, 2014, Par ███████ of its dexmedetomidine hydrochloride injection product, with ███ per tray, for approximately ███ ██. If recalled, all of this product would have to be destroyed. The amount sold is roughly equal to a month-and-a-half supply to Par's customers, and therefore, if Par was kept off the market until the end of Sandoz's 180-day exclusivity (10-months from now), Par would lose ██ ███.

14.     In the last ten years, the FDA has only recalled two Par products out of hundreds that were manufactured, and in each case, all units were destroyed. Par has no protocol or system in place to sell and deliver a product, recall it, store it, and then resell it to its customers again. Once the product leaves Par's chain of custody, it cannot be resold for a host of reasons.

4

First, it is unclear what portion of the sold products can even be recalled because much of Par's products may have already made their way to patients and possibly even used. Par's customers are drug wholesalers. Second, Par's product is temperature controlled. Par's label states: "Store between 20° to 25°C (68° to 77°F). (See USP Controlled Room Temperature.)." A true and correct copy of Par's product label is attached as Exhibit 6. Because Par cannot know how customers stored the product before shipping it back to Par, its later sale of such products would violate FDA regulations.

15.    Par would likely have to destroy any of its product already manufactured due to the impending expiration dates of the product. Although Par's product has a shelf-life of 24 months, by both contract and industry custom, Par cannot sell any product that does not have at least 12 months of its shelf-life remaining. Par began manufacturing batches of its product in September 2013, on the expectation that the FDA would approve its ANDA in January 2014. Within the next few weeks, starting in September 2014, all of those products will have less than one-year of shelf-life remaining and Par will no longer be able to sell them to any of its customers. Even if Par could resell recalled products, the cost to do so would be prohibitively expensive and damage Par's reputation in the industry.

16.    Even if Par could resell recalled products, it is not equipped to handle voluntarily recalled products. Pursuant to FDA regulations, Par would have to develop a proper and validated way to inspect each of the returned vials, and Par would have to create a validated method for inspection and reshipment of recalled products—which costs time and money. Furthermore, each shipment of glass vials results in breakage for some percentage of the vials. Even a hairline fracture in a vial can compromise the drug's sterility—which is catastrophic for a sterile injectable product such as Par's product. Not only would Par have to pay for the returned shipments from its customers, Par has every reason to expect that customers returning a

"recalled" product would be less careful than Par in packing the product for shipment because its customers would presume that Par intended to destroy it anyway. Even worse, by reneging on existing contracts, Par would have to pay penalties, which in some cases, are more than the value of the product itself.

17.     Even if Par spends the enormous resources and time to recall its products, there is no reason to believe that wholesalers would buy them. Because drug recalls have only ever occurred due to safety or efficacy reasons, and as far as I know, never for pure patent reasons, customers are likely to presume that Par is attempting to sell damaged, and even potentially dangerous, goods. The mere attempt to sell "recalled" drug products would tarnish Par's reputation in the industry. All drug recalls are published on the FDA website, and again, because the type of recall sought by Hospira in unprecedented, the industry is likely to assume that Par had safety or efficacy problems with its products. Industry participants prefer suppliers that have a reputation for manufacturing drugs without safety or efficacy problems, and the awareness that a manufacturer resells recalled drugs would raise doubt towards the integrity of the manufacturing process. Therefore, beyond the financial devastation Par would endure from a recall, Par's reputation would be harmed.


I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of August 2014.

_Tony Pera_

Tony Pera

# Exhibit 1



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville, MD  20857

Docket No. FDA-2014-N-0087

**SENT VIA EMAIL**

Dear Dexmedetomidine Hydrochloride Injection NDA/ANDA Applicant:

We are writing to solicit comment on certain legal and regulatory issues that pertain to Precedex (dexmedetomidine hydrochloride injection, 100 mcg (base)/mL packaged in 200 mcg(base)/2 mL single-dose vials).  We understand that different applicants may have different views on these issues, and we are establishing a public process to help the agency resolve them.  This letter is being sent to:  Hospira, Inc., the owner of New Drug Application (NDA) No. 21-038 for Precedex (Dexmedetomidine Hydrochloride Injection); and to all applicants that submitted Abbreviated New Drug Applications (ANDAs) to the Food & Drug Administration (FDA or the Agency) referencing Precedex.  Applicants who have already provided their views to FDA are asked to resubmit them for FDA's and other applicants' consideration as part of this docket.  This letter is also being posted on the website for FDA's public dockets at http://www.regulations.gov.

Precedex is approved for the following indications:

1. Sedation of initially intubated and mechanically ventilated patients during treatment in an intensive care setting.  Administer Precedex by continuous infusion not to exceed 24 hours.
2. Sedation of non-intubated patients prior to and/or during surgical and other procedures.

Hospira, Inc. has listed several patents covering the Precedex product referenced above.  Only a method-of-use patent remains: U.S. Patent No. 6,716,867 (the '867 patent), which expires (including a pediatric exclusivity period) on October 1, 2019.[1]

Hospira originally listed the '867 patent in May 2004 with the following use code (U-572): "Intensive care unit sedation."  In November 2008, Hospira listed U.S. Patent No. 5,344,840 (the '840 patent) with the following use code (U-912) in the Orange Book: "Sedation of non-intubated patients prior to and/or during surgical and other procedures."  That patent expired on September 6, 2011.  On January 6, 2014, Hospira sought to amend the '867 use code to "intensive care unit sedation, including sedation of non-intubated patients prior to and/or during surgical and other procedures."  FDA, in accordance with the ministerial manner in which it implements patent use code information, changed the use code on January 8, 2014 (U-1472).

---

[1] U.S. Patent No. 4,910,214 expired on July 15, 2013, and an associated pediatric exclusivity period expires on January 15, 2014.

FDA seeks comments on the following issues:

1. Does the breadth of the new use code description for the '867 patent foreclose ANDA applicants from gaining approval for any of the approved indications (or for any subset of those indications) before the '867 patent expires? For example, would it be permissible as a scientific, regulatory, and legal matter for an ANDA applicant to submit a statement under 21 U.S.C. §355(j)(2)(A)(viii) and a corresponding carve out that results in an approval for a subset of the second approved indication, *i.e.*, an approval explicitly limited to procedures outside of an intensive care setting? In this context, is it acceptable to add new words to the approved indication to limit the indication to exclude only that portion of the indication that is covered by the use code (i.e., to exclude sedation of non-intubated patients in the ICU setting only)? If you believe a carve out of this type is permissible, if you wish, you may submit a side by side of the indication section of the labeling for dexmedetomidine hydrochloride injection showing the carve out that you believe would be acceptable.

2. Whether the fact that Hospira changed the use code information outside of the 30-day window after the patent issued means that the use code change is late listed as to any ANDAs pending with a section viii statement at the time the use code was changed? *See* 21 C.F.R. § 314.53(c), (d). If so, would any ANDA with an existing section viii statement be entitled to retain that statement (and corresponding carve out) under 21 C.F.R. § 314.94(a)(12)(vi), notwithstanding the change in use code?

3. What relevance, if any, to a determination of whether the use code change was timely submitted is the fact that Hospira previously listed the '840 patent with very similar use code information to that now listed for the '867 patent, and did not change the use code for the '867 patent until after the '840 patent expired?

We are asking that you submit your initial comments to http://www.regulations.gov by close of business on January 24, 2014. Commenters submitting in the initial comment period will have an opportunity to respond to comments from other commenters. Please submit these responses to http://www.regulations.gov by close of business January 31, 2014. Please include the proper docket number, FDA-2014-N-0087, in your correspondence. Please also send a copy of your submissions to Dave Read, Regulatory Counsel in the Office of Generic Drugs, at david.read@fda.hhs.gov. If you have any questions regarding this correspondence, please contact Mr. Read at 240-276-9320.

Sincerely yours,

*{See appended electronic signature page}*

Kathleen Uhl, M.D.
Acting Director
Office of Generic Drugs
Center for Drug Evaluation and Research

2

---------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---------------------------------------------------------------------------------------------------

/s/
-------------------------------------------------------

ROBERT L WEST
01/15/2014
Deputy Director, Office of Generic Drugs, for
Kathleen Uhl, M.D.

# Exhibit 2



Division of Dockets Management
U.S. Food and Drug Administration
via www.regulations.gov

January 24, 2014

Re:    Docket # FDA-2014-N-0087 concerning Dexmedetomidine Hydrochloride
       Injection

Dear Sir or Madam:

       We are writing in response to the Agency's invitation to submit comments concerning the
regulatory and legal issues raised by Hospira, Inc.'s decision to change the patent use code for
U.S. Patent No. 6,716,867 (the '867 patent) relating to the reference listed drug (RLD)
Precedex® (dexmedetomidine hydrochloride injection, 100 µg (base)/mL packaged in 200 µg
(base)/2mL single-dose vials).

## INTRODUCTION

       As the Agency's January 15, 2014 letter opening this docket (the "Agency's Letter")
indicates, Precedex is currently approved for two indications as follows:

| Date approved | Indication |
|---|---|
| 1999 | Sedation of initially intubated and mechanically ventilated patients during treatment in an intensive care unit setting. Administer by continuous infusion not to exceed 24 hours. |
| 2008 | Sedation of non-intubated patients prior to and/or during surgical and other procedures. |

In these comments, the first-approved indication is referred to as the "ICU indication" and the
second-approved indication is referred to as the "procedural indication."

Several patents and use codes have also been listed in the "Orange Book" for Precedex. These are summarized as follows:

| Patent | Use code | Expiration of patent and associated exclusivity |
|--------|----------|------------------------------------------------|
| 5344840 ('840 patent) | (U-912) Sedation of non-intubated patients prior to and/or during surgical and other procedures | Sept. 6, 2011 |
| 4910214 ('214 patent) | (U-421) Use for sedation | Jan. 15, 2014 |
| '867 patent | Originally: (U-572) Intensive care unit sedation | Mar. 31, 2019 |
| | Modified Jan. 6,2014: (U-1472) Intensive care unit sedation, including sedation of non-intubated patients prior to and/or during surgical and other procedures | |

JHP Pharmaceuticals, LLC (JHP) submitted an abbreviated new drug application (ANDA) referencing Precedex and seeking to sell dexmedetomidine for only the procedural indication following the January 15, 2014 expiration of the pediatric exclusivity associated with the '214 patent. JHP's ANDA therefore "carved out" the ICU indication and made a corresponding "section viii statement" to the '867 patent pursuant to 21 U.S.C. § 355(j)(2)(A)(viii). JHP believes that at least one additional ANDA applicant (Mylan Institutional) also carved out the ICU indication and made a section viii statement to the '867 patent.

Other applicants did not seek to carve out the ICU indication and instead filed "paragraph IV" certifications to the '867 patent pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV). Litigation ensued over the '867 patent, and in May 2012, the United States District Court for the District of New Jersey ruled that the '867 patent was invalid in litigation involving Hospira and Sandoz. (See Exhibit 1, Memorandum Opinion in *Hospira, Inc., v. Sandoz, Inc.,* No. 09-cv-4591 (D.N.J.)) Hospira appealed this decision to the United States Court of Appeals for the Federal Circuit, and in early December 2013 – while the appeal was still pending – Hospira announced a settlement of the litigation that appears to be contingent upon the district court vacating the invalidity ruling. Following a limited remand from the Federal Circuit, on December 23, 2013, Hospira and defendant Sandoz jointly asked the district court to vacate its invalidity ruling. (See Exhibit 2, Brief in Support of Indicative Ruling Supporting Vacatur, docket No. 401 in No. 09-cv-4591; see also docket Nos. 404-406.) As of Thursday, Jan. 23, 2014, the district court's decision on the motion is pending. Then, about one week before the expiration of the pediatric exclusivity associated with the '241 patent, Hospira submitted patent information to the Agency changing the '867 patent's U-572 use code to the present U-1472 code. Hospira's new use code

2

still begins with "intensive care unit sedation" but adds the phrase "including sedation of non-intubated patients prior to and/or during surgical and other procedures."

In connection with these events, the Agency has asked for comment on three issues. These issues involve: (1) the appropriateness and/or scope of carve outs in light of Hospira's new use code; (2) whether the timing of Hospira's use code change implicates the "late listing" provisions of the Hatch-Waxman Act and applicable regulations; and (3) the relevance of the timing of U-1472 and its similarity to an earlier use code for the '840 patent to the determination of whether U-1472 is late listed. JHP's position on these issues is summarized below.

1.      (a) The procedural indication is a non-ICU indication. The new use code description for the '867 patent (U-1472) does not foreclose an ANDA applicant from carving out the ICU indication and obtaining approval for the procedural indication only, because there is no overlap between U-1472 and the procedural indication. If Hospira is asserting that there is such an overlap, Hospira is providing untruthful patent information to the Agency and to the public because Hospira has already told two federal courts that the '867 patent does not cover the procedural indication.

(b) If the Agency nonetheless believes that there is an overlap between U-1472 and the procedural indication, the Agency can and should permit a carve out of a subset of the procedural indication, *i.e.*, ANDA approval for the procedural indication may be explicitly limited to procedures outside of the ICU setting. Further, it is acceptable to add new words to the approved ANDA procedural indication to limit it so as to exclude ICU patients.

2.      (a) If the Agency believes that no carve out whatsoever is permitted because of the new use code U-1472, then the fact that Hospira changed the use code information outside of the 30-day window after the '867 patent issued means that U-1472 is late listed as to any ANDAs pending with a section viii statement at the time the use code was changed. That is because Hospira was required to submit additional patent information – including a use code – associating the '867 patent with the procedural indication within thirty days of the date that indication was approved if Hospira believed the procedural indication applied to the '867 patent. Hospira's new use code represents an assertion that the scope of the patent protection afforded by the '867 patent is different and broader than previously asserted. Such an assertion is no different than late listing a new patent because both claim additional protection beyond what was originally claimed.

(b) Because the same statutory rationale applying to late listed patents applies to late listed use codes, the late listing of U-1472 means that any ANDA with an existing section viii statement made before Hospira listed U-1472 should be entitled to retain that statement and the corresponding carve out notwithstanding the change in use code.

3.      (a) In the eyes of the public, Hospira equated the '840 patent exclusively with the procedural indication and the '867 patent exclusively with the ICU indication. If Hospira's new use code is now read to overlap with the procedural indication, the change is not "timely submitted" for the same reasons as discussed above because U-1472 expands the scope of protection associated with the '867 patent more than thirty days after it issued.

3

## ANALYSIS

### I.   The Appropriateness and/or Scope of Carve Outs in Light of Hospira's New Use Code

The Agency seeks comment on whether "the breadth of the new use code description for the '867 patent foreclose[s] ANDA applicants from gaining approval for any of the approved indications (or for any subset of the those indications) before the patent expires[.]" JHP submits that the new U-1472 use code does not foreclose ANDA applicants from carving out the ICU indication and gaining approval for the procedural indication before the expiration of the '867 patent, because there is no overlap between U-1472 and the procedural indication. However, in the event that the Agency does believe there is an overlap, then the Agency may permit JHP and similarly-situated ANDA applicants to carve out a portion of the procedural indication to make clear that it expressly excludes sedation in the ICU setting.

#### A.   The New Use Code Does Not Foreclose ANDA Applicants from Carving Out the ICU Indication and Gaining Approval for the Procedural Indication

Hospira's previous use code for the '867 patent was "intensive care unit sedation." (U-572.) Just as the exclusivity associated with all other remaining patents was about to expire, Hospira submitted patent information to the Agency that changed the use code for the '867 patent to "intensive care unit sedation, including sedation of non-intubated patients prior to and/or during surgical and other procedures." (U-1472.) Hospira's new use code U-1472 begins with the phrase "intensive care unit sedation" (found in the old use code U-572) and then proceeds by use of the phrase beginning with "including" to identify a narrower subset of individuals whom Hospira asserts fall within the scope of ICU sedation. Thus, Hospira's new use code is essentially the same as its original use code for "Intensive care unit sedation."

The old use code U-572 did not cover the separate procedural indication, and the new use code U-1472 likewise does not cover the separate procedural indication. We know this because in the litigation with Sandoz concerning the '867 patent, **Hospira explicitly told the U.S. Court of Appeals for the Federal Circuit and the U.S. District Court for the District of New Jersey that the '867 patent does not cover the procedural indication**. We attach materials from the public litigation dockets in those cases. Exhibit 3 is an excerpt from Hospira's Jan. 11, 2013 brief filed before the Federal Circuit. (Exhibit 4 is the entire brief for reference.) On page 76 of its brief, Hospira told the Federal Circuit:

> In analyzing the nexus to the '867 patent, [Hospira's expert] Dr. Addanki was mindful of Precedex's second [procedural] indication, *which is not covered by the '867 patent.*

(Emphasis added). Hospira further added that:

> Dr. Adanki attributed all sales above his projected curve to the procedural indication, *not* to the patented ICU indication.

4

(Exhibits 3, 4, at p. 77) (emphasis in original, which emphasizes that the procedural indication is not covered by the '867 patent). Hospira made the essentially the same statements in its post-trial briefing to the district court in New Jersey (see Exhibit 5 at p. 61-63) and its counsel confirmed to the district judge during closing arguments that the procedural indication had been covered earlier by the expired '840 patent but was *not covered* by the '867 patent. (See excerpt from trial transcript of April 5, 2012, attached as Exhibit 6, at pp. 2087, 2089-90.) Hospira's representations to two different federal courts were not idle statements; they were integral to Hospira's defense of the validity of the '867 patent.[1] Accordingly, Hospira, by its choice of use code language before this Agency -- confirmed by its representations to two different federal courts – cannot have intended for U-1472 to encompass the procedural indication.

In reliance upon the old use code U-572, JHP proceeded with its section viii statement and corresponding carve out of the ICU indication. JHP believes the carve out is clinically safe and scientifically sound and did not receive any indication that the Agency thought otherwise, as JHP believes it was days away from obtaining final approval with the carve out.[2] JHP's label carves out the ICU indication and information relating to treatment in the ICU, and JHP seeks approval only for the separate procedural indication. JHP's "ICU-free" label simply does not overlap with U-1472, *which requires sedation in an ICU*. Simply put, the procedural indication is a non-ICU indication. Accordingly, the Agency should allow JHP to continue with its carve-out of the ICU indication and its section viii statement.

As noted above, JHP assumes that Hospira's representations to two federal courts and the public about the scope of its patent protection are accurate. Thus, Hospira's new use code U-1472 merely adds some confusion about this topic but does not change the fact that the procedural indication is outside its scope. If, however, Hospira is asserting that U-1472 covers the procedural indication in any respect whatsoever, then Hospira has made an untruthful statement to the Agency and the public. Hospira through its attorney agents is under an obligation to present truthful testimony and argument to the federal courts. Because Hospira asserted to two federal courts that the '867 patent *does not* cover the procedural indication, if it is now asserting to this Agency that the '867 patent *does* cover the procedural indication, then Hospira appears to be making an untruthful statement to the Agency for the apparent purpose of preventing section viii carve outs and requiring ANDA applicants to instead file paragraph IV

---

[1] Hospira asserted that Precedex was "commercially successful" in order to defend the validity of the '867 patent. To do this, Hospira needed to demonstrate the sales of Precedex attributable to indications covered by the '867 patent only. Thus, if Hospira really believed the '867 patent covered the procedural indication, it could have included sales for that indication along with the ICU indication, thus increasing the amount of sales in the commercial success calculus. Hospira did not do so. Instead, in attempting to demonstrate that it had performed the correct analysis, Hospira made clear that it did not count sales attributable to the unpatented procedural indication.

[2] Similarly, it appears probable from publically-available information that at least Mylan Institutional had also filed a section viii statement with a carve-out of the ICU indication, and that the Agency found this acceptable. Mylan had received tentative approval for its dexmedetomidine product before January 15, 2014, and had not been sued by Hospira over the '867 patent, suggesting that Mylan did not file a paragraph IV certification.

certifications. This will unduly delay generic entry into the market.[3] The Agency may not be required to accept and implement a use code change that is incomplete because it is based on verifiably inaccurate information. *See* 21 C.F.R. §§ 314.53(c)(1) and 314.53(c)(2)(i)(Q) (2011).[4]

**B.      It is Permissible to Carve Out a Subset of an Approved Indication and, if Necessary, Add Words to an ANDA Label to Facilitate Such a Carve Out**

The Agency also asks whether "it would be permissible as a scientific, regulatory, and legal matter" to permit a "carve out that results in an approval for a subset of the second approved indication, i.e., an approval explicitly limited to procedures outside of an intensive care unit setting[,]" and, if so, whether it would be "acceptable to add new words to the approved indication" to facilitate such a carve out. Although JHP does not believe it is necessary to address this question for the reasons discussed in section I.A., JHP recognizes that the Agency is considering this option and therefore submits that it would be acceptable. That is, if the Agency believes that U-1472 covers a subset of the procedural indication, this subset can be effectively carved out of the procedural indication, and express words can be used to do so.

---

[3] Unless the Agency considers the submission of patent information for the '867 patent that changed its use code to be untimely as discussed in Section II below, then requiring applicants to change a section viii statement to a paragraph IV certification may result in a 30-month stay of approval of their applications (if sued by Hospira) and/or delay generic entry until 180 days after Sandoz enters the market, because Sandoz appears to be the first ANDA applicant to file a paragraph IV certification. Either would likely delay generic competition until at least June 2015, since the contingent Hospira-Sandoz settlement allows for Sandoz to begin marketing under a license in December 2014. (See news article announcing settlement, attached as Exhibit 7.)

The situation is further complicated by the fact that Hospira has asked the district court in New Jersey to vacate its '867 patent invalidity ruling. In seeking an indicative ruling supporting vacatur prior to the Federal Circuit's limited remand, Hospira argued that vacatur was in the "interests of justice" and would "conserve the valuable time and resources of the Federal Circuit and this Court." (See Exhibit 2 at 7) but did not explain to the court that publicly available information suggested at least one ANDA applicant with a carve out (Mylan) was likely poised to enter the market in January 2014, and that vacatur could result in expensive re-litigation with carve out applicants. Hospira was well aware of at least Mylan's section viii statement because the implications of Mylan's tentative approval were well-known to those in the pharmaceutical industry. *See* FDA Denial of Request for Reconsideration in FDA-2013-P-0247 (posted Dec. 4, 2013), at 2 -3 (noting that the labelling carve out process is "well established in FDA law" and that the listed drug holder was "a sophisticated company with respect to the development and marketing of generic drugs and can reasonably be expected to have anticipated such carve outs"). Hospira's formal motion to vacate was filed December 23, 2013, and Caraco Pharmaceutical Laboratories Ltd. subsequently sought to intervene in order to oppose vacatur. (See Docket Nos. 404 and 410 in No. 09-cv-4591 (D.N.J.))

[4] 21 C.F.R. § 314.53(c) states that the Agency "will not accept the patent information unless it is complete and submitted on the appropriate forms, FDA Forms 3542 or 3542a." Among the information required for completion is a signed verification in which the signatory verifies under penalty of perjury that "this is an accurate and complete submission of patent information for the NDA, amendment or supplement pending under section 505 of the Federal Food, Drug, and Cosmetic Act." 21 C.F.R. § 314.53(c)(2)(i)(Q). JHP suggests that it would be in the public interest for the Agency to post the Forms 3542 and/or 3542a associated with Precedex in this docket.

Section 505(j)(2)(A) of the Food, Drug and Cosmetic Act (FDCA) outlines the requirements for approval of ANDAs. Notably, 21 U.S.C. § 355(j)(2)(A)(i) embodies the well-established principle that an ANDA applicant may rely on safety and efficacy data previously submitted by the sponsor of the RLD. Section 355(j)(2)(A)(i) provides in relevant part that:

> (A) An abbreviated application for a new drug shall contain—
>
>> (i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug") . . . .

21 U.S.C. § 355(j)(2)(A)(i). Note that there is no requirement in this provision that an ANDA be approved for all of the indications or conditions of use approved in the RLD label. *Bristol-Myers Squibb Co. v. Shalala,* 91 F.3d 1493, 1500 (D.C. Cir. 1996). That is because § 355(j)(2)(A)(i) merely requires that the conditions of use for which the ANDA applicant seeks approval have been *previously approved* for an RLD – not that they be *identical to all* of the approved indications or conditions of use in the RLD.

This ability to seek approval for less than all approved conditions of use is a well-established aspect of the generic drug regulatory scheme that Congress clearly encouraged when it passed the Hatch-Waxman Act. *See generally, Warner-Lambert Co. v. Apotex Corp.,* 316 F.3d 1348 (Fed. Cir. 2003) (explaining same). As is well-known, the Hatch-Waxman Act (the Act) provided certain exclusivities and patent term extensions for RLDs while at the same time promoting generic competition by a variety of methods, including allowing carve outs. *See id. at* 1357-58. Consistent with this approach, § 355(j)(2)(A)(viii) contemplates that when ANDA applicants do not seek approval for methods of use protected by a patent, they may file a "section viii statement" rather than a paragraph IV certification.[5] Filing a paragraph IV certification may provoke a lawsuit and thereby result in a 30-month stay of approval of the ANDA, 21 U.S.C. § 355(j)(5)(B)(iii), whereas filing a section viii statement does not result in a 30-month stay of approval. Thus, the ability to seek approval for less than all of the RLD's approved conditions of use facilitates one of the principal goals of the Hatch-Waxman Act: "to get generic drugs into the hands of patients at reasonable prices -- fast." *In re Barr Labs, Inc.,* 930 F.2d 72, 76 (D.C. Cir. 1991).

Another requirement for ANDA approval is outlined in § 355(j)(2)(A)(v), which requires that:

---

[5] 21 U.S.C. § 355(j)(2)(A)(viii) provides that an ANDA shall contain:

> if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

the labeling proposed for the new [generic] drug is the same as the labeling approved for the listed drug . . . except for changes required because of differences approved under [suitability petitions] or because the new drug and the listed drug are produced or distributed by different manufacturers[.]

21 U.S.C. § 355(j)(2)(A)(v). The clear rationale behind this "sameness" requirement is that "[t]he generic drug program is based on the principle that products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product." Supplemental Applications Proposing Labeling Change for Approved Drugs and Biological Products, 78 Fed. Reg. 67985, 67988 (Nov. 13, 2013).

The "sameness" requirement, however, does not mandate absolute word-for-word identity between the RLD label and the ANDA label. On its own terms, it contains an exception when changes are required because the ANDA and the RLD are "produced or distributed by different manufacturers." One such instance is when an ANDA applicant seeks approval for less than all of the conditions of use approved in the RLD label. *Bristol-Myers*, 91 F.3d at 1500. The court in *Bristol-Myers* expressly rejected an RLD holder's contention that the "sameness" requirement forbade the FDA from approving an ANDA with a carve out. *See id.* The Agency had approved an ANDA for a new generic drug even though the label of the generic product did not include all of the indications that appeared on the label of the RLD drug. *Id.* at 1499. In explaining its approval despite differences in the labeling, the Agency relied on § 355(j)(2)(A)(v)'s exception for "different manufacturers." *Id.* at 1500. The court agreed, reasoning that the Agency's interpretation "works in harmony with" other provisions of the FDCA. *Id.* Notably, then, the "different manufacturers" exception to the "sameness" requirement is broad and permits differences based on carve outs for patent purposes. And of course, such carve outs remain consistent with the rationale behind the sameness requirement because they still permit the public to have confidence that the generic product is safe and effective.

The Agency has also promulgated regulations to facilitate the carve out process. The Agency's principle labeling regulation states:

Labeling . . . proposed for the drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under [a suitability petition] or because the drug product and the reference listed drug are produced or distributed by *different manufacturers*. Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug *may include* differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication *or other aspect of labeling* protected by patent or accorded exclusivity under section 505(j)(4)(D) of the act.

21 C.F.R. § 314.94(a)(8)(iv) (2012) (emphasis added).

8

This broadly-worded regulation is noteworthy in three aspects. First, it acknowledges that ANDA labels may differ from RLD labels because of changes needed due to the fact that the ANDA drug will be produced or distributed by a *different manufacturer*. Second, by its choice of language stating that such differences *"may include,"* followed by a list of possible differences, the regulation provides a *non-exhaustive* list of examples of how ANDA labels may differ from RLD labels. Third, among that non-exhaustive list of examples, the regulation permits omission of an indication "*or other aspect of labeling*" subject to patent protection. The latter language was specifically included in the original implementing language for the purpose of permitting carve outs for more than just indications alone, in response to public comments that ANDA submitters would need adequate protection from induced infringement suits by RLD holders.[6] Thus, it is clear that the regulation is broad in scope as to the types of label differences it will allow in order to facilitate the Act's goal of permitting early entry of generic competition while ensuring public confidence in the safety and efficacy of generic drugs.

The breadth of the regulation is illustrated in part by the holding in *Zeneca, Inc. v. Shalala*, 213 F.3d 161 (4th Cir. 2000). In *Zeneca*, the RLD holder challenged the Agency's decision to allow the addition of language to the ANDA label in order to provide a safety warning for the ANDA product due to a difference in formulation. *See id.* at 165-66. The ANDA product contained sulfite, whereas the RLD product did not. *See id.* Zeneca argued that labeling differences permitted under the regulations were limited to merely listing the differences. *See id.* at 169; *see also Zeneca, Inc. v. Shalala*, No. 99-307, 1999 U.S. Dist. LEXIS 12327, at *33 (D. Md. Aug. 11, 1999). The appellate court squarely rejected that argument, noting that the Agency's interpretation of its regulation to allow the addition of language to the label was reasonable where it facilitated a permitted variation in formulation between the ANDA and RLD products. *See Zeneca*, 213 F.3d at 169. In other words, both the Agency and the court allowed for the addition of language to the ANDA label in order to facilitate a variation permitted under the Hatch-Waxman Act. *See id.*

The Agency's question whether it is permissible to allow a "carve out that results in an approval for a subset of the second approved indication," and whether it would be "acceptable to add new words to the approved indication" to facilitate such a carve out, must be considered in light of the foregoing law. JHP submits that it is acceptable to add language to an ANDA label following the procedural indication stating: "Not for intensive care unit sedation." (This addition, along with deletion of other information from the RLD label, is hereafter referred to as "JHP's suggested carve out.")

To begin, there is no principled reason why an "indication" to be omitted cannot include a subset of an approved indication. As noted, the principal statutory requirement is that the ANDA's "conditions of use prescribed, recommended, or suggested in the labeling" have been *previously approved* in the RLD – not that they be *identical to all* of the approved indications or conditions of use in the RLD labeling. 21 U.S.C. § 355(j)(2)(A)(i). The procedural indication has

---

[6] The labeling regulation as originally proposed by the Agency did not include the phrase "or other aspect of labeling." Abbreviated New Drug Application Regulations, 54 Fed. Reg. 28662, 28872 (Jul. 10, 1989). The Agency included the latter phrase in its final regulations in response to a proposal to broaden the language in order to protect ANDA applicants from induced infringement claims. Abbreviated New Drug Application Regulations, 57 Fed. Reg. 17950, 17962 (Apr. 28, 1992).

been previously approved. Removing a purported subset of individuals from the population under that indication does not change the fact that the condition of use for which the ANDA label seeks approval has been previously approved. Further, the statute does not refer to "indications" at all *per se,* but rather "conditions of use," so there is nothing requiring that the ANDA applicant seek approval for the entire RLD indication as long the ANDA drug is still safe and effective.

Permitting JHP's suggested carve out is also consistent with § 355(j)(2)(A)(viii), which contemplates section viii statements relating to a patented "method of use" and thereby focuses the corresponding carve out on the *patented method of use* rather than a specific *approved indication.* Although in many instances the patented method of use may correspond precisely to an approved indication, this provision does not specifically require such one-to-one correspondence. This statutory language emphasizes that permitting a carve out of less than an approved indication facilitates the Hatch-Waxman Act's goal of permitting early generic drug through carve outs without prompting litigation and a 30-month stay.

Similarly, permitting JHP's suggested carve out is consistent with the statutory language in § 355(j)(2)(A)(v) requiring that the ANDA have the "same" label. JHP's suggested carve out would still "provide health care practitioners with the essential scientific information needed to facilitate prescribing decisions," 78 Fed. Reg. 67985, 67986, and assure physicians, health care providers, and consumers that a generic drug is as safe and effective as its brand counterpart, *see* 57 Fed. Reg. 17950, 17961. And it is most assuredly a permitted difference due to a difference in manufacturers. 21 U.S.C. § 355(j)(2)(A)(v); *Bristol-Meyers,* 91 F.3d at 1500.

Moreover, JHP's suggested carve out falls squarely within the scope of the Agency's broad labeling regulation. JHP's suggested carve out is clearly due to a difference in manufacturers. The list of possible label differences in the regulation is non-exhaustive and thereby provides the Agency with broad discretion to permit differences consistent with the purpose of the Hatch-Waxman Act. And with respect to differences due to patent protection, the list already includes *other aspects of labelling* in addition to indications – in particular to permit ANDA applicants to avoid dubious induced infringement suits. JHP's suggested carve out falls within these non-exhaustive exceptions and is consistent with the goals of the Hatch-Waxman Act.

Additionally, the fact that JHP's suggested carve out would add express language to the ANDA label is not a barrier to Agency acceptance. The Fourth Circuit's *Zeneca* decision makes clear that the addition of language to an ANDA label is legally permitted under the regulation, especially where it facilitates the purpose of the Act. Nor does the fact that the regulation refers to "omission" of patent-related information impose a barrier to Agency acceptance. The *Zeneca* decision holding that the regulation does not merely allow a mechanical listing of differences is applicable here. The addition of language to the label in *Zeneca* facilitated the purpose of the Act to permit safe and effective generic drugs; similarly, the addition of JHP's suggested language here would facilitate the Act's purpose of omitting alleged patent protected methods of use from JHP's label. The regulation's language referring to "omission" must be viewed in light of the Act's purpose. It does not refer to mechanical word-for-word deletion of language. *See Zeneca,* 213 F.3d at 169.

Finally, JHP's suggested carve out is scientifically sound. JHP's removal from the label of other clinical information relating to the ICU indication was acceptable to the Agency, and there is clearly no safety concern with affirmatively clarifying that use for the procedural indication does not extend to the ICU indication that has already been removed. Adding the statement "[n]ot for intensive care unit sedation" meets all legal and scientific requirements and facilitates the purpose of the Act.

Based on the foregoing, if the Agency believes that U-1472 covers some aspect of the procedural indication, this subset can be effectively carved out of the procedural indication, and express words can be used to do so.

## II.   Hospira's Untimely Use Code Change Implicates the Late Listing Provisions of the Act and Applicable Regulations

The Agency seeks comment on whether the fact that Hospira submitted patent information to the Agency changing the '867 patent use code more than 30 days after that patent issued means that the use code change is "late listed as to any ANDAs pending with a section viii statement at the time use code was changed[,]" and, if so, whether "any ANDA with an existing section viii statement [would] be entitled to retain that statement (and corresponding carve out)[.]" JHP's response to this question assumes for the purposes of this response only that U-1472 overlaps with the procedural indication. As discussed above, JHP does not believe any overlap exists. However, if the Agency believes there is such overlap, then Hospira's submission of patent information changing the use code for the '867 patent to use code U-1472 is untimely and therefore late listed as to ANDAs pending with a section viii statement at the time the use code was changed. Further, any such ANDA is entitled to retain its original section viii statement to the '867 patent and corresponding carve out.

### A.   Statutory and Regulatory Background

Section 505(b)(1)(G) of the FDCA requires NDA applicants to include patent information relating to any patent which, among other things, claims a method of using the drug for which approval is being sought with respect to which a claim of infringement could reasonably be asserted against an unlicensed third party. 21 U.S.C. § 355(b)(1)(G). Patent information under this section includes the patent number, the expiration date of the patent, and for a patent claiming a method of use, the use code. *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* 132 S.Ct. 1670, 1683-85 (2012). Section 505(c)(2) of the FDCA likewise imposes a similar obligation on NDA holders when the patent information could not have been submitted with the original NDA application, such as when the patent issues after that time, or a new indication is approved for the approved product. 21 U.S.C. § 355(c)(2). This statutory section, and its accompanying regulations, are implicated here.

The Agency's implementing regulation for the foregoing statutes is 21 C.F.R. §314.53(c)(2)(ii).[7] This regulation requires that patent information be submitted to the FDA in

---

[7] 21 C.F.R. § 314.53(c)(2)(ii) provides, in relevant part:

several circumstances, and specifies the timing for doing so. For example, patent information must be submitted within 30 days of approval of a supplemental NDA ("sNDA"). In addition, if a new patent issues that covers an approved method of use for the approved drug product, patent information with respect to that patent must be submitted within thirty days of patent issuance. Where an issued patent relates to an approved method of use, the NDA holder must identify each claim in the patent relating to an approved indication and provide a description of the patented method for publication. 21 C.F.R. 314.53(c)(2)(ii)(P). This description is known as the "use code."

As stated above, patent information, including a use code for a patent claiming an approved indication, must be submitted within 30 days of approval of a sNDA. 21 C.F.R. § 314.53(d)(2).[8] This includes whenever a "new indication or other condition of use" is approved.

---

> *Submission of patent information upon and after approval.* Within 30 days after the date of approval of its application or supplement, the applicant shall submit FDA Form 3542 for each patent that claims the drug substance (active ingredient), drug product (formulation and composition), or approved method of use. FDA will rely only on the information submitted on this form and will not list or publish patent information if the patent declaration is incomplete or indicates the patent is not eligible for listing. Patent information must also be submitted for patents issued after the date of approval of the new drug application as required in paragraph (c)(2)(ii) of this section. As described in paragraph (d)(4) of this section, patent information must be submitted to FDA within 30 days of the date of issuance of the patent. . . . The following information and verification statement is required:
>
> . . .
>
> (P) Information on each method-of-use patent including the following:
>
> (1) Whether the patent claims one or more approved methods of using the approved drug product and a description of each approved method of use or indication and related patent claim of the patent being submitted;
>
> (2) Identification of the specific section of the approved labeling for the drug product that corresponds to the method of use claimed by the patent submitted; and
>
> (3) The description of the patented method of use as required for publication . . . .

---

[8] 21 C.F.R. § 314.53(d)(2) provides in relevant part:

> (d)*When and where to submit patent information* --
>
> . . .
>
> (2)*Supplements.* (i) An applicant shall submit patent information required under paragraph (c) of this section for a patent that claims the drug, drug product, or method of use for which approval is sought in any of the following supplements:
>
> . . .
>
> (B) To add a new indication or other condition of use, including a change in route of administration;

21 C.F.R. 314.53(d)(2)(i)(B). In such circumstances, even if the NDA holder has previously submitted patent information for a specific patent, it must again submit patent information for that same patent if the NDA holder asserts that the patent claims the new indication. 21 C.F.R. § 314.53(d)(2)(ii). The information which must be submitted is the same information "described in paragraph [314.53(c).]" § 314.53(d)(i), – which includes the use code. *See also* Applications for FDA Approval to Market a New Drug: Patent Submission and Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying That a Patent Claiming a Drug is Invalid or Will Not Be Infringed—Part III, 68 Fed. Reg. 36676, 36686 (June 18, 2003). Thus, if an existing patent covers a newly-approved indication, the NDA holder must submit patent information, including a use code, if it asserts that the existing patent covers the new indication.

The purpose for requiring patent information to be submitted within 30 days of the issuance of a new patent or approval of a new indication is to ensure prompt public notice that the NDA holder believes the patent claims the approved drug product or approved method of use, and to permit legal issues to be resolved as early as possible. 68 Fed. Reg. 36676, 36684. With respect to patents claiming approved indications, the identification of those patents and their corresponding use codes alert ANDA applicants to the existence of a patent that claims an approved use. *Id.* at 36683.

Failure to comply with the thirty day deadline has serious ramifications for an NDA holder. 21 C.F.R. §314.94(a)(12)(vi)[9] states that an ANDA applicant with a pending application containing an appropriate patent certification does not have to certify to a patent issued after NDA approval where patent information was not submitted to the FDA within thirty days of patent issuance. This is intended to effectuate Congress' intent to "enforce timely submission of patent information." Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions, Part II, 59 Fed. Reg. 50338, 50347 (Oct. 3, 1994). Consistent with the public notice function of the thirty day deadline, this requirement discourages NDA holders from "gaming the system." Indeed, during rulemaking, it was proposed that the NDA holder be allowed to update its patent information at any time without penalty. The Agency stated: "[t]his approach has been rejected because it would allow for manipulation of the patent filing system by the holder of the NDA and could result in delays in approval of otherwise approvable ANDAs." 59 Fed. Reg. at 50340. If an ANDA applicant were required to change its section viii statement and corresponding carve out in response to a late listed patent, NDA holders could lie in wait until

. . .

(ii) If the applicant submits a supplement for one of the changes listed under paragraph (d)(2)(i) of this section and existing patents for which information has already been submitted to FDA claim the changed product, the applicant shall submit a certification with the supplement identifying the patents that claim the changed product.

. . .

(3)*Patent information deadline.* If a patent is issued for a drug, drug product, or method of use after an application is approved, the applicant shall submit to FDA the required patent information within 30 days of the date of issuance of the patent.

[9] Discussed *infra*.

shortly before generic approval was expected and then list a new patent in order to provoke a paragraph IV certification, litigation, and potentially a 30 month delay in ANDA approval due to the automatic stay in 21 U.S.C. § 355(j)(5)(B)(iii). This prejudice to an ANDA applicant is something that the FDA sought to avoid in issuing this regulation. *Id.*

### B.    Hospira's Use Code Change is Late Listed

The '867 patent issued on April 6, 2004. At that time, the only indication for Precedex was the ICU indication. In accordance with § 355(c)(2) and 21 C.F.R. §§ 314.53(c)(2)(ii) and 314.53(d), if the '867 patent covered the ICU indication, Hospira was required to submit patent information to the FDA within 30 days of issuance of the patent. It apparently did so, and among other things provided a use code for that patent – "Intensive care unit sedation" (U-572). Thus, the public, and in particular ANDA applicants, were informed that Hospira considered the '867 patent to cover the ICU indication.

In October, 2008, the FDA approved Hospira's supplemental NDA for the procedural indication. Therefore, pursuant to 21 C.F.R. §§ 314.53(c)(2)(ii) and (d), Hospira had 30 days to submit patent information relating to the procedural indication. Presumably within that time period, Hospira submitted patent information for the now expired '840 patent. This patent issued in 1994, long before the procedural indication was approved. The use code Hospira provided for the '840 patent was U-912, "Sedation of non-intubated patients prior to and/or during surgical and other procedures." U-912 matched exactly the newly approved procedural indication.

Even though the '867 patent was already listed in the Orange Book for Precedex at the time the Agency approved the procedural indication, Hospira was obligated to submit patent information for it, including a new use code, if Hospira believed that the '867 patent also covered the procedural indication. 21 C.F.R. §314.53(d)(2); *see also* 68 Fed. Reg. 36676, 36686 ("We require information on whether the patent being submitted has been submitted previously for the NDA or supplement referenced in the [patent information form]. For example, an earlier-listed patent may have included several method-of-use claims but only one method of use previously approved and submitted. A second method of use may be approved in a supplement and must be submitted for listing.") Hospira failed to do so in that it did not submit patent information modifying the use code for the '867 patent within thirty days of when the procedural indication was approved in a manner that indicated to the public that the '867 patent covered the procedural indication as well as the ICU indication. Accordingly, Hospira's use code change is late listed, in violation of 21 C.F.R §§314.53(c)(2)(ii) and 314.53(d).[10]

### C.    JHP Should be Permitted to Maintain its Section viii Statement and Corresponding Carve Out

---

[10] Hospira may argue that it did not need to modify the use code for the '867 patent after the procedural indication was approved because the existing U-572 code already covered the procedural indication. If so, that begs the question why Hospira has to modify it now. It would also be incorrect for the reasons discussed in section III *infra*.

As previously noted, 21 C.F.R. 314.94(a)(12)(vi) states that if a patent on a listed drug is late listed, an ANDA applicant with a pending ANDA that contained an appropriate patent certification before the submission of the untimely patent information is not required to provide an amended patent certification.[11] Specifically, the regulation provides in relevant part:

> (vi) *Late submission of patent information.* If a patent on the listed drug is issued and the holder of the approved application for the listed drug does not submit the required information on the patent within 30 days of issuance of the patent, an applicant who submitted an abbreviated new drug application for that drug that contained an appropriate patent certification before the submission of the patent information is not required to submit an amended certification.

21 C.F.R. § 314.94(a)(12)(vi). JHP's ANDA with a section viii statement and corresponding carve out of the ICU indication was submitted before and was pending at the time of Hospira's late listing of the '867 use code change. Section 314.94(a)(12)(vi) therefore applies to JHP's present situation, for several reasons.

First, the literal language of §314.94(a)(12)(vi) has been met. When the procedural indication was approved in 2008, the '867 patent had been "issued" for much longer than 30 days. Hospira then failed to submit timely patent information that it considered the '867 patent to cover the procedural indication by amending the use code, and did not do so until after JHP's submission of its ANDA containing a proper section viii statement to that patent. As a result, the literal language of §314.94(a)(12)(vi) applies. JHP is not required to submit a revised certification with respect to the '867 patent.

To the extent it is submitted that §314.94(a)(12)(vi) applies only to new patents issued after approval of the NDA or sNDA rather than to previously existing patents that were simply not listed earlier, that argument is foreclosed by the Agency's actions with respect to donepezil ODT. There, the NDA was approved on October 18, 2004, for treatment of dementia of the Alzheimer's type. (Exhibit 8, printout from Drugs@FDA.) Although U.S. Patent No. 4,895,841 ("the '841 patent") issued in 1990, the NDA holder (Eisai) failed to submit patent information to the FDA stating that the '841 patent covered the donepezil ODT product or its approved method of use until after Mutual Pharmaceutical had submitted an ANDA for that product on November 11, 2005. In approving Mutual's ANDA, the Agency stated that the Mutual did not need to certify against the '841 patent because (1) the patent information with respect to the '841 patent was submitted more than 30 days after the '841 patent issued, and (2) Mutual's ANDA was submitted prior to Eisai submitting patent information for the '841 patent. (Exhibit 9, FDA Dec. 11, 2009 approval letter for Mutual ANDA 077975.) This reading of §314.94(a)(12)(vi) complies with congressional intent and was affirmed upon judicial review. *Eisai Co. Ltd. v. Mutual Pharm. Co., Inc.,* No. 06-3613, 2007 U.S. Dist. LEXIS 93585, at *5-6, *46 (D.N.J. Dec. 20, 2007).

Second, JHP is not required to submit a revised certification because §314.94(a)(12)(vi) applies to *use codes* as well as patents. The section refers to *patent information* and allows the

---

[11] This includes a proper section viii statement. Section viii statements are included in § 314.94(a)(12), which is entitled "Patent Certification."

ANDA holder to forego a new certification if the NDA holder does not "submit the *required information on the patent* within 30 days." (Emphasis added.) The requirements for submitting "patent information" are outlined in 21 C.F.R. § 314.53. Section 314.53(a) states that "[t]his section applies to any applicant who submits to FDA a new drug application or an amendment to it under *section 505(b)* of the act[.]" (Emphasis added.) Section 314.53(b) outlines the patents for which patent information must be submitted, and § 314.53(c) lists the patent information that must be provided pursuant to § 314.53(a). There, § 314.53(c)(2)(ii)(P)(3) requires submission of "the description of the patented method of use as required for publication," *i.e.,* the use code. This is consistent with the holding in *Caraco* that patent information under § 355(b)(1)(G) includes the *use code. Caraco,* 132 S.Ct. at 1683-85. Thus, § 314.94(a)(12)(vi) applies to use codes.

Third, applying § 314.94(a)(12)(vi) to use codes comports with the purpose and function of the Act. The untimely submission of a new use code that broadens the patent coverage of a previously listed patent is analogous to the issuance of a new patent – the NDA holder is asserting that the patent now covers something that it did not cover before. This is illustrated by the present facts. Until its extremely belated change to the use code for the '867 patent, Hospira indicated to ANDA applicants and the general public that it considered the '867 patent to cover only the ICU indication. Indeed, it led the FDA to conclude exactly the same thing, as prior to the use code change, the FDA was apparently ready to approve JHP's ANDA carving out the ICU indication and making a section viii statement to the '867 patent. Now, to the extent that the FDA believes the new use code also covers the procedural indication, Hospira has indicated that the '867 patent coverage is now broader than it previously asserted. This is the exact same scenario as failing to timely provide patent information for a patent issued after approval of the procedural indication and covering that indication. The consequences to Hospira as the result of its failure should be the same as well.

### III.    The Timing of U-1472 and its Similarity to an Earlier Use Code for the '840 Patent Supports a Determination that U-1472 is Late Listed

As previously noted, Hospira listed the '840 patent with a use code U-912 that matched the procedural indication after it received approval for that indication. At the same time, Hospira maintained U-572, the previous use code for the'867 patent, and did not provide patent information for the '867 patent indicating that the '867 patent also covered the procedural indication. In addition, there was a close correlation between the language of U-912 and the procedural indication, as well as the language of U-572 and the ICU indication. Hospira therefore effectively told the public that the '840 patent applied exclusively to the procedural indication and the '867 patent applied exclusively to the ICU indication. That is how the public understandably was entitled to view the situation, and that is precisely what Hospira represented to a federal court in 2012 when it told the New Jersey District Court that the procedural indication had been covered earlier by the expired '840 patent but was *not covered* by the '867 patent:

> THE COURT: And that other approved label use [the procedural indication]; is that the subject of a patent application?

16

[HOSPIRA'S COUNSEL]: The other approved label use is related to the perioperative use in the '840 patent, which is now expired, so the '867 patent is the patent for ICU sedation. . . .

THE COURT: You've answered my question, which is, at this time, there's no patent on the second approved use as distinguished from the compound itself.

[HOSPIRA'S COUNSEL]: Not on the method of use, that's right. . . .

(See Exhibit 6 at pp. 2089-90.)

Hospira then laid in wait – until more than two years after the '840 patent expired and days before generic competition was to enter the market before changing the use code associated with the '867 patent from U-572 to U-1472, which as the Agency noted is very similar to the old '840 use code – both include the exact language from the procedural indication. If Hospira's new use code is now read to overlap with the procedural indication, the change is not "timely submitted" for the same reasons as discussed in section II above because U-1472 expands the scope of protection associated with the '867 patent in the eyes of the public more than thirty days after the patent issued, to the prejudice of ANDA applicants such as JHP, and general public.

## CONCLUSION

JHP submits that if the Agency decides in accordance with any of the positions JHP has outlined herein, the Agency's decision would be accorded substantial deference if a legal challenge resulted, pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). A contrary decision by the Agency would permit NDA holders to manipulate the patent system and drug approval process, contrary to the Hatch-Waxman Act and to the Agency's own stated purpose for its choice of implementing regulations.

Thank you for the opportunity to present JHP's views on these matters. Please contact me if you have any questions or require further information.

Sincerely,

/s/ Steve Richardson

Steve Richardson
Vice President, Scientific and Regulatory Affairs
JHP Pharmaceuticals

cc:    Dave Read
       Regulatory Counsel, Office of Generic Drugs
       david.read@fda.hhs.gov

## EXHIBIT LIST

1.  Amended Memorandum Opinion filed May 4, 2012, in *Hospira, Inc., v. Sandoz Inc.,* No. 09-cv-4591 (D.N.J.)

2.  Hospira's December 6, 2013, Brief in Support of Indicative Ruling Supporting Vacatur, in No. 09-cv-4591

3.  Excerpt from Hospira's January 11, 2013 brief filed before the United States Court of Appeals for the Federal Circuit in *Hospira, Inc. v. Sandoz, Inc.,* No. 12-1426

4.  Hospira's January 11, 2013 brief filed before the Federal Circuit

5.  Hospira's Post-Trial Memorandum in No. 09-cv-4591 (public version filed May 8, 2013)

6.  Excerpt from April 5, 2012 Trial Transcript in No. 09-cv-4591, pp. 1943, 1944, 2087-2092, and 2121

7.  IP 360 News article from announcing Hospira-Sandoz settlement on Dec. 6, 2013

8.  Drugs@FDA printout for donepezil ODT as of Jan. 21, 2014

9.  FDA Dec. 11, 2009 approval letter for Mutual ANDA No. 077975

# Exhibit 3



**PHARMACEUTICALS**
Partners for Healthcare Excellence

Division of Dockets Management
U.S. Food and Drug Administration
via www.regulations.gov

January 31, 2014

Re:    Docket No. FDA-2014-N-0087 concerning Dexmedetomidine Hydrochloride
        Injection – Responsive Comments

Dear Sir or Madam:

In accordance with the Agency's original letter opening the above-referenced docket, I am writing on behalf of JHP Pharmaceuticals, LLC (JHP) to respond to comments made by others on January 24, 2014.

## I.    Hospira's Comments Lack Credibility

Hospira, Inc. (Hospira) has now made clear that it believes its late listed new use code for U.S. Patent No. 6,716,867 (the '867 patent), U-1472, includes the procedural indication[1] for Precedex.™ By doing so, Hospira has also made clear that its comments lack any credibility and are therefore entitled to no weight.

As JHP previously pointed out, Hospira clearly and unequivocally told two separate federal courts on more than two occasions that *the '867 patent did not cover the procedural indication.* (JHP comments at pp. 4-5.) Hunton & Williams also provides another example where Hospira made this same representation to the United States District Court for the District of New Jersey. (Hunton & Williams comments at pp. 2-3.) Hospira will undoubtedly now try to minimize, distinguish, or disavow those statements.[2] But the fact remains that Hospira made one set of representations about the scope of the '867 patent to two federal courts, and now makes a completely opposite representation to this Agency. Hospira's earlier representations to the courts are also consistent with what Hospira previously told the Agency and the public by virtue of its associating U.S. Patent No. 5,344,840 (the '840 patent) exclusively with the procedural indication and the '867 patent exclusively with the ICU indication.

---

[1] As in JHP's original comments, I use the phrase "procedural indication" to refer to the indication approved in 2008 and the phrase "ICU indication" to refer to the indication approved in 1999.

[2] Notably, as of January 30, 2013, Hospira has not withdrawn its Federal Circuit brief in which it told the court that the '867 patent does not cover the procedural indication.

JHP Pharmaceuticals, LLC
Morris Corporate Center 2 ¦ One Upper Pond Road ¦ Building D, 3rd Floor ¦ Parsippany, NJ 07054
Phone 973 658 3530 ¦ fax 973 658 3582
www.JHPPharma.com

Hospira's statements about the rationale for its eleventh-hour use code change are also not believable. According to Hospira, it submitted new patent information for the '867 patent to merely "clarify" the scope of the '867 patent after it learned allegedly for the first time through "market chatter" that the Agency was going to approve an ANDA for dexmedetomidine with a carve out of the ICU indication, because according to Hospira the Agency and other ANDA applicants were "confused" about the scope of the use code that had been associated with the '867 patent since 2004. This should not be believed. Hospira undoubtedly knew as of March 2013—over ten months ago—that at least one ANDA applicant had filed a section viii carve out statement to the procedural indication. That is because according to the Agency's own Drugs@FDA website, Mylan Institutional (Mylan) received tentative approval for its dexmedetomidine ANDA on March 3, 2013. The implications of Mylan's tentative approval were well-known to those in the pharmaceutical industry.[3] As this Agency has recently observed with respect to another recent blatant attempt to stifle generic competition, the labeling carve out process is "well established in FDA law" and, like here, the listed drug holder was "a sophisticated company with respect to the development and marketing of generic drugs and can reasonably be expected to have anticipated such carve outs." *See* FDA Denial of Request for Reconsideration in FDA-2013-P-0247 (posted Dec. 4, 2013), at pp. 2 -3. Furthermore, in November 2013 Hospira told the SEC and the public in its Quarterly Report (Form 10-Q) that:

> Based on the current status of the Precedex™ patent litigation, Hospira's U.S. patent coverage for the non-premix versions of Precedex™ will expire January 15, 2014. *It is possible that Hospira could face generic competition at any time on or after such date* which would have a material adverse impact on Hospira's net sales of Precedex™ and related results of operations.

(Exhibit 10, Hospira's Form 10-Q for the Period ending Sept. 30, 2013, filed Nov. 6, 2013, at p. 31) (emphasis added).) Accordingly, the Agency should put no stock in Hospira's explanation for its last-minute use code change.[4]

---

[3] If Mylan had filed a paragraph IV certification instead of a section viii statement with a corresponding carve out, it would have notified Hospira, and Hospira would either have sued Mylan as it did Sandoz and Caraco, or would have reached some out of court settlement, as it apparently did with Akorn and one other ANDA submitter. No such record of a lawsuit, or the fact that Mylan provided Hospira with notice of a paragraph IV certification to the '867 patent, can be found in the federal courts' PACER dockets or in Hospira's annual or quarterly SEC reports. These annual or quarterly SEC reports list any paragraph IV notice received by Hospira for Precedex.

[4] Sandoz's comments concerning the new use code and the scope of the '867 patent are likewise entitled to no weight. Sandoz currently tells the Agency that the scope of the '867 patent includes the procedural indication. (Sandoz comments at p.4.) But like Hospira, Sandoz's comments differ from what Sandoz told two federal courts. In successfully convincing the district court in New Jersey that the '867 patent was invalid, Sandoz told the district court that "[i]n 2008 Precedex was approved for a second indication— procedural use outside the ICU, *an indication not covered by the claims of the '867 Patent*." (See Exhibit 11, excerpt from the public version of Sandoz trial brief in No. 09-cv-4591 (D.N.J.), filed May 17, 2012, at p.128 (emphasis added).) Sandoz similarly told the Federal Circuit that the district court correctly excluded sales attributable to the procedural indication in determining that they were not related to the'867 patent. (See Exhibit 12, Sandoz Federal Circuit brief filed Apr. 15, 2013, at p.60.) Sandoz's changed statements are clearly based on the fact that Sandoz now also has an incentive to keep other

Finally, Hospira goes to great lengths to point out that the Agency has a ministerial duty not to allow carve outs, because the Agency does not evaluate the scope of patent protection and is bound by what Hospira tells it about the scope of the '867 patent. (See Hospira comments at pp. 7-9.) In other words, Hospira is using the FDA's ministerial function with respect to patent information to manipulate the regulatory system to stifle otherwise lawful generic competition. Hospira is in effect telling the Agency, "we know we told you something different about the '867 patent than we told two federal courts, but too bad—you are obligated to follow what we now say." The Agency is not powerless to act, however.

First, JHP agrees with comments by Leydig, Voigt & Mayer that the Agency should consider referring this matter to the Federal Trade Commission for possible investigation. (See Leydig, Voigt & Mayer comments at p. 6.) The Agency has an obligation to further the purpose and goals of the Hatch-Waxman Act (the Act), and a referral to the FTC by another government agency after a careful evaluation of the circumstances here will carry considerable weight and may deter similar anticompetitive gamesmanship by others.[5]

Second, regardless of the Agency's ministerial function with respect to patent information, *the Agency is particularly well-suited to assess the scope and meaning of the indications that it approved for Precedex.* It cannot be disputed that the Agency possesses the scientific and regulatory expertise to consider the scope of the approved clinical indications for Precedex in determining whether there is overlap with the '867 patent use code. To that end, JHP agrees with Actavis's comment that the Agency is "obligated to[] apply its clinical and regulatory expertise in drug reviews and approvals, and take into account the administrative history of its own review and approval of the drug at issue, in order to interpret the scope and meaning of the approved labeled uses." (Actavis comments at p. 4.) As discussed below, that is precisely what is at issue here. JHP submits that when the Agency brings its expertise to bear on the scope of the approved Precedex indications, it should find that the new use code for the '867 patent does not overlap with the procedural indication. However, even if the Agency decides that there is some degree of overlap, the Agency has sound scientific and regulatory grounds to allow a carve out removing such overlap.

---

generics off the market, because as the first applicant to file a paragraph IV certification Sandoz could block all other ANDAs if they were likewise required to file paragraph IV certifications rather than section viii statements.

[5] As the Agency recently explained:

> [I]n light of the well-established generic drug approval practice that permits a carve out of patent-protected conditions of use, the holder of a reference listed drug need not wait until it has explicit acknowledgment that a generic applicant is pursuing a carve out strategy before raising concerns about the possibility of such a carve out with FDA. Certainly, we cannot countenance an innovator strategy of waiting until the last moment to try to obtain a formal acknowledgment and then filing the petition in the 11th hour, with the result of delaying generic competition.

FDA-2013-P-0247, at p.4 (Dec. 4, 2013).

3

## II.     A Carve Out is Permissible

Nothing in the comments by Hospira or others changes JHP's view that (a) the procedural indication is a non-ICU indication that does not overlap with U-1472, but that (b) even if the Agency concluded there was overlap, the Agency can and should permit a carve out of the procedural indication excluding ICU use and can add express words to do so.

### A.     The Procedural Indication Does Not Overlap with U-1472

At the outset, JHP reiterates that *the Agency has the appropriate expertise and the obligation to determine the scope of the procedural indication* – regardless of whatever Hospira asserts about the scope of its '867 patent. As discussed below, JHP concurs with Actavis and with Hunton & Williams that the scope of the procedural indication does not include ICU sedation.

First, the language of the procedural indication itself says nothing about sedation in an ICU.[6] Rather, the approved language simply refers to "Sedation of non-intubated patients prior to and/or during surgical and other procedures." Coupled with the separate, first-approved indication explicitly mentioning ICU sedation, the message is clear that the procedural indication was and is intended for use outside of an ICU.

Second, the pivotal clinical studies *as described in the RLD label* that supported the safety and efficacy of the procedural indication (and resulted in its approval) do not involve ICU patients. The approved language describing the pivotal trials is important, because this language contains the imprimatur of the Agency and describes to the prescribing public exactly what the approval was based upon. That is, the scope of the indication should be commensurate with the scope of the trials that support the indication. *See* 21 C.F.R. § 201.57(c)(15) (2013) (Clinical studies section of the label must "discuss those clinical studies that facilitate an understanding of how to use the drug safely and effectively. Ordinarily, this section will describe the studies that support effectiveness for the labeled indication(s), including discussion of study design, population, endpoints, and results . . . .") Here, what the Precedex label says about the trials supporting the procedural indication does not suggest that they involved ICU sedation. Indeed, there is no discussion about any clinical trials in section 14.2 ("Procedural Sedation") of the label that "facilitate[s] an understanding of how to use the drug safely and effectively" in seriously ill patients in the ICU.

Third, although the supplemental NDA materials describing these pivotal trials are not available at Drugs@ FDA, a review of the two publications describing these trials makes clear that they were not conducted on ICU patients. In both Candiotti, *et al.* ("Candiotti," attached as Exhibit 13)[7] and Bergese, *et al.* ("Bergese," attached as Exhibit 14),[8] the subjects participating

---

[6] The approved Precedex label is available at Drugs@ FDA and elsewhere.

[7] Keith A. Candiotti *et al.*, *Monitored Anesthesia Care with Dexmedetomidine: A Prospective, Randomized, Double-Blind, Multicenter Trial*, AMBULATORY ANESTHESIOLOGY 110(1): 47-56 (Jan. 2010).

4

were selected from patients scheduled for elective procedures. (See Ex. 13 at p. 48; Ex. 14 at p. 587.) The entry for these trials at the Federal Government's website Clinicaltrials.gov also confirms that they involved patients scheduled for elective procedures. Specifically, the website describes these studies as follows:

> Clinical trial NCT00398827 [Candiotti]:
>
> Purpose (in part):  Surgical Procedures, ***Elective***
>
> Detailed Description (in part):  An estimated 325 patients (260 DEX, 65 PBO) requiring MAC sedation for an ***elective*** surgery/procedure will be randomized at approximately 25 investigative sites.
>
> Eligibility, criteria (in part):  Subject requires an ***elective*** surgery/procedure expected to take longer than 30 minutes

(http://clinicaltrials.gov/ct2/show/NCT00398827?term=NCT00398827&rank=1) (emphases added).

> Clinical trial NCT00383890 [Bergese]:
>
> Title: A Safety and Efficacy Study of Patients Requiring Sedation for ***Elective*** Awake Fiberoptic Intubation.
>
> Purpose: The purpose of this study is to evaluate the safety and efficacy of dexmedetomidine versus placebo used for sedation during ***elective*** awake fiberoptic intubation.
>
> Detailed Description (in part):  An estimated 100 subjects (50 DEX, 50 PBO) scheduled for an ***elective*** awake fiberoptic intubation because of a potentially difficult airway will be randomized prior to intubation at approximately 18 investigative sites.

(http://clinicaltrials.gov/ct2/show/study/NCT00383890?term=NCT00383890&rank=1) (emphases added). Because the patients selected for these studies were by definition undergoing elective procedures, they were not as ill as ICU patients for whom the ICU indication is intended. Thus, JHP agrees with Actavis that these studies do not support approval for pre- or peri-procedural use in the group of more seriously ill patients who by virtue of such illness are in the ICU. (See Actavis comments at p. 6.)

Fourth, the duration of dexmedetomidine treatment contemplated for the ICU indication is different from the duration of treatment contemplated for the procedural indication. The ICU indication allows for *continuous infusion up to 24 hours*, whereas the procedural indication clearly contemplates shorter-term, one-time use. For example, the mean duration of dexmedetomidine infusion in the Bergese study (involving awake fiberoptic intubation) was approximately 38 minutes (See Ex. 14 at p. 589.) Although the Candiotti study does not

---

[8] Sergio D. Bergese *et al.*, *A Phase IIIb, Randomized, Double-Blind, Placebo-Controlled, Multicenter Study Evaluating the Safety and Efficacy of Dexmedetomidine for Sedation During Awake Fiberoptic Intubation*, AM J THERAPEUTICS 17:586-595 (2010).

expressly state the mean duration of dexmedetomidine infusion, it appears likely to be no more than 3 – 4 hours given the description of the procedures performed and the results described in the publication.[9] Thus, again, these studies do not support approval for continuous infusions of up to 24 hours as allowed by the ICU indication.

Hospira's contention regarding how some practitioners use Precedex in an ICU setting does not alter the scope of the procedural indication approved by the Agency. Hospira submitted two declarations by clinicians who attest that they use Precedex to assist in performing procedures on non-intubated ICU patients. Because the FDA has not approved Precedex for this indication, the declarations by Drs. Friedman and Riker amount to little more than evidence that they prescribe Precedex for off-label uses. Drs. Friedman and Riker may be free under the laws of their respective states to do so, but that has nothing to do with the Agency's determination of the scope of the procedural indication.[10]

Notably, Hospira's own October 30, 2008 press release announcing approval of the procedural indication similarly supports the conclusion that Hospira—who worked closely with the Agency to obtain the indication—believed the Agency had approved the procedural indication for non-ICU patients. The press release, which quotes Dr. Candiotti, a co-author of both publications describing the pivotal trials, states in relevant part:

> "This expanded indication makes Precedex a more versatile product," said Keith Candiotti, M.D., vice chairman of Clinical Research for the Department of Anesthesiology at the University of Miami School of Medicine. "Anesthesiologists *now have the data* to safely administer Precedex in an operating room setting *for a number of outpatient procedures* that are growing in volume such as orthopedic, vascular and ophthalmic procedures."

(Exhibit 15 (emphasis added); also available at http://phx.corporate-ir.net/phoenix.zhtml?c=175550&p=irol-newsArticle&ID=1219872&highlight.)

In sum, the Agency clearly has the expertise to assess the scope of the approved procedural indication, and the Agency can and should determine that its scope does not include ICU sedation. As several commenters have pointed out, the plain language of the use code requires ICU sedation, and even Hospira acknowledges that much. Because there is no overlap between the approved procedural indication and the U-1472 use code despite Hospira's belated, brazen attempt to make it otherwise, the Agency should approve JHP's ANDA (and those of applicants similarly situated) for the procedural indication, with a carve out of the ICU indication.

---

[9] The procedures in Candiotti were "expected to last at least 30 min and included orthopedic, ophthalmic, plastic, vascular stents, breast biopsies, hernias, ateriovenous fistulas, and excision of lesions." (Ex. 13 at p. 48.) The study drug "was discontinued when the patient left the operating room." (Id.) The "median length of time from the start of study drug until a rescue dose of midazolam" was administered was up to 114 minutes for the higher-dose dexmedetomidine group. (Id. at p.50.)

[10] Hospira's exhibits purporting to show publications in which Precedex was used to assist with procedures in ICU patients are similarly irrelevant because even if Hospira is correct about their content, they merely describe off-label use.

**B.      It is Permissible to Carve Out a Subset of an Approved Indication and, if Necessary, Add Words to an ANDA Label to Facilitate Such a Carve Out**

JHP does not believe it is necessary to address this question for the reasons discussed in section II.A. However, even if the Agency believes that U-1472 covers a subset of the procedural indication, this subset can be effectively carved out of the procedural indication, and express words can be used to do so.

### 1.      It is permissible to carve out a subset of an indication

JHP disagrees with Hospira's contention that carving out a subset of the procedural indication would be impermissible because that would somehow convert it to a "new indication." (Hospira comments at pp. 9-10.) The law simply requires that the conditions of use for which JHP seeks approval be "previously approved." 21 U.S.C. § 355(j)(2)(A)(i) (2011). The procedural indication—*i.e.,* sedation of non-intubated patients prior to and/or during surgical and other procedures—was previously approved as safe and effective based on the two pivotal studies described above. Assuming for the sake of argument that some subset of patients (those in the ICU) who might be eligible for treatment according to the procedural indication are removed from a larger group of patients eligible for treatment according to the procedural indication consisting of both ICU and non-ICU patients, that does not alter the fact that the Agency previously approved the conditions of use for the remaining persons (those not in the ICU) from the larger group. Notably, the use of dexmedetomidine in this latter group would still be safe and effective. Hospira's contentions to the contrary are nonsensical.

Hospira cites a House Report purporting to support its position. In context, that report was merely explaining why the newly-enacted Hatch-Waxman Act was displacing an older Agency practice that presumably allowed ANDA products to be approved with conditions of use that had *not* been previously approved for the pioneer drug. H.R. Rep. 98-857(1), at 21 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2654. The legislative history cited by Hospira thus adds nothing to what the relevant statute already clearly says – that the primary requirement for approval of a condition of use in an ANDA is that it must be "previously approved." 21 U.S.C. § 355(j)(2)(A)(i). Nobody here disputes that proposition. Hospira's comments about the legislative history are thus irrelevant.

In sum, it is permissible to carve out a "subset" of an approved indication because all that is required is that the remaining portion of the indication for which the ANDA applicant seeks approval be previously approved. In this instance, it has.

### 2.      It is permissible to add words to a label to facilitate a patent carve out

Focusing exclusively on language from 21 C.F.R. § 314.94(a)(8)(iv) referring to "omission" of language from an RLD label protected by patent, Hospira and Sandoz contend that a mechanical word-for-word deletion is the only label difference permitted under the regulation. (Hospira comments at pp. 10-11; Sandoz comments at pp. 5-6.) Even assuming they are correct with their interpretation of the specific word "omission," however (and they are not), both Hospira and Sandoz ignore the plain language of the entire regulation, which is worth repeating:

> Labeling . . . proposed for the drug product must be the same as the labeling
> approved for the reference listed drug, except for changes required because of
> differences approved under [a suitability petition] or because the drug product and
> the reference listed drug are produced or distributed by different manufacturers.
> Such differences between the applicant's proposed labeling and labeling approved
> for the reference listed drug *may include* differences in expiration date,
> formulation, bioavailability, or pharmacokinetics, labeling revisions made to
> comply with current FDA labeling guidelines or other guidance, or omission of an
> indication or other aspect of labeling protected by patent or accorded exclusivity
> under section 505(j)(5)(F) of the act.

21 C.F.R. § 314.94(a)(8)(iv) (2012) (emphases added).

The phrase "may include" is dispositive of the argument put forth by Hospira and Sandoz. Regardless of how one interprets "omission," the regulation makes clear that it is part of a *non-exhaustive* list of possible label differences attributable to different manufacturers. Thus, even if "omission" referred solely to word-for-word deletion, the plain language of the regulation permits *additional differences beyond those listed -- i.e., beyond "omissions" due to patent carve outs.* And as several commenters made clear, pursuant to *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 169 (4th Cir. 2000), the Agency may allow additional language to facilitate a variation due to different manufacturers that furthers the purpose of the Hatch-Waxman Act—which also clearly includes patent carve outs.[11] Thus, the single-minded focus on "omission" by Hospira and Sandoz is irrelevant.

Further, the authority cited by Hospira and Sandoz in support of their position is inapposite. Hospira cites the Agency's decisions in Nos. FDA-2010-P-0545 (Feb. 24, 2011) and 2010-P-0087 (Jul. 30, 2010) as Agency pronouncements that "omission of words or phrases" and "minor attendant changes to ensure that the language reads properly" are the "only" permissible differences to facilitate patent carve outs. (Hospira comments at p.10.) These Agency decisions say no such thing. Instead, the decisions relate to whether the proposed ANDA use would still be safe under the proposed carve outs, and the discussion relied upon by Hospira is boilerplate language that provides a general description of permissible differences between RLD and ANDA labels. Notably, both decisions nowhere state that these differences are the "only" permissible differences. Rather, both decisions state that "[s]uch differences *may include* omissions of words or phrases from the RLD's labeling . . . ." (FDA CDER to UCB Inc. - Petition Denial in FDA-2010-P-0545, at p.10 (emphasis added); FDA CDER to Sandoz Inc. - Petition Denial in FDA-2010-P-0087, at p. 9.) Hospira's characterization of those decisions is therefore inaccurate. Similarly, the decision in FDA No. 2003P-0140 (now FDA-2003-P-0179) (Nov. 7, 2003), at pp. 5-9 (cited in Sandoz comments at p. 6) likewise does not address the issue here; it concerns labeling differences involving a § 505(b)(2) application and does not really discuss patent carve outs at all. Finally, Hospira's and Sandoz's reliance on *Astrazeneca LP v. Apotex, Inc.*, 623 F. Supp. 2d 615 (D.N.J. 2009) is also misplaced. The cited portion merely refers to the opinion of a witness in infringement litigation. *See id.* at 616. In short, the alleged authority relied upon by

---

[11] As JHP previously noted, *Bristol-Myers Squibb Co. v. Shalala,* 91 F.3d 1493, 1500 (D.C. Cir. 1996) affirmatively held that patent carve outs fall within the ambit of label differences attributable to different manufacturers. (JHP comments at pp. 8, 10.)

8

Hospira and Sandoz for their argument that only a mechanical word-for-word deletion from an RLD label is permissible does not support that proposition.

Even directly considering the specific "omission" language referred to by Hospira and Sandoz, it is clear that this language does not exclusively mandate a mechanical word-for-word deletion of language from the RLD label. JHP agrees with the comments by Hunton & Williams that the "omission" example in the regulation "speaks to the omission of an indication or other aspect of labeling, not to the words by means of which the omission might be accomplished." (Hunton & Williams comments at p. 5.) That interpretation is confirmed by the language of the corresponding regulation identifying reasons for refusing to approve an ANDA, 21 C.F.R. § 314.127(a)(7) (2013), which permits acceptable labeling "differences" due to patent or exclusivity protection and does not use the word "omission" at all. (See also Hunton & Williams comments at p. 5-6.)[12]

### III.   U-1472 is Late Listed and ANDAs with Existing Section viii Statements are Entitled to Retain those Statements

Again, JHP emphasizes it is not necessary for the Agency to address this question because the Agency can permit a carve out of the ICU indication without concern for alleged overlap with U-1472. Nonetheless, assuming the Agency believes there is overlap, JHP agrees with the several commenters who have pointed out that the Agency's regulations concerning this issue encompass late listed *patent information* as well as merely late listed patents. As previously shown, "patent information" includes *use codes*. (JHP comments at pp. 11-12.)

Hospira's comments on this issue are incomplete and unpersuasive, and except for its citation to *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26 (D.D.C. 2006), have already been addressed and fully rebutted by JHP and other commenters. Hospira focuses solely on the word "patent" in the regulations and ignores the fact that the regulations also refer to *"patent information"* and require the RLD holder to submit new *patent information* within thirty days of obtaining a new indication applicable to that patent. (Hospira comments at pp. 13-14.) Hospira's reliance on *Sandoz* is unpersuasive. The issue in *Sandoz* concerned whether an ANDA applicant was

---

[12] § 314.127 states, in pertinent part:

**Refusal to approve an abbreviated new drug application.** (a) FDA will refuse to approve an abbreviated application for a new drug under section 505(j) of the act for any of the following reasons:

. . .

(7) Information submitted in the abbreviated new drug application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the abbreviated new drug application except for changes required because of differences approved in a [suitability petition] or because the drug product and the reference listed drug are produced or distributed by different manufacturers or because aspects of the listed drug's labeling are protected by patent, or by exclusivity, and such differences do not render the proposed drug product less safe or effective than the listed drug for all remaining, nonprotected conditions of use.

required to certify to a patent that had been delisted and then relisted pursuant to a court order; the court was therefore only considering the applicability of the regulation to patents and was not addressing use codes at all. *See Sandoz,* 439 F. Supp. 2d at 29-31. Thus, Hospira's emphasis on the word "only" in the court's opinion to suggest the court was ruling on the applicability of the regulation to use codes is inaccurate and misleading.

The law is clear. Pursuant to 21 C.F.R. § 314.53(d)(2)(i)(B) (2011), an NDA holder "shall submit *patent information* required under paragraph (c) of this section [§ 314.53(c)] for a patent that claims the drug, drug product, or method of use for which approval is sought in any of the following supplements: . . . [t]o *add a new indication or other condition of use . . . .*" (emphases added.) The *patent information* required under § 314.53(c) includes *use codes.* 21 C.F.R. § 314.53(c)(2)(ii)(P). The *patent information* must be listed within 30 days of issuance of the patent. 21 C.F.R. §§ 314.53(d)(1), 314.53(d)(3). Failure to timely list the *patent information* means that an ANDA applicant whose ANDA was previously submitted with an appropriate certification is not required to submit a paragraph IV certification. 21 C.F.R. § 314.94(a)(12)(vi).

The Agency's January 24, 2014 release of Hospira's Form 3542 submissions verifies that Hospira's U-1472 use code submission is late listed, and that Hospira was aware of the listing requirements. According to the forms, the '867 patent issued April 6, 2004, and Hospira submitted its original U-572 use code (intensive care unit sedation) on May 6, 2004. The FDA approved the procedural indication on October 17, 2008, and Hospira did not submit a new use code for the '867 patent within thirty days indicating that the patent covered the procedural indication. In contrast, Hospira *did* submit a use code for the '840 patent indicating that it covered the procedural indication, albeit a few days late. In submitting the '840 patent information, Hospira wrote that it was "aware that this submission is outside *the 30 days from indication approval permitted by the regulations*" but did not believe it prejudiced any third party. (Hospira letter accompanying Form 3542 for '840 patent, Nov. 21, 2008 (emphasis added).) Thus, Hospira was well aware of the requirement that new *patent information* be listed within thirty days of approval of the procedural indication. It chose not to do so for the '867 patent, and its current late submission prejudices those who submitted ANDAs in the interim in the same manner that the late submission of a patent would. Accordingly, those who submitted ANDAs in the interim containing a section viii statement should not now be required to submit a paragraph IV certification.

## IV.    The Remaining Hodge-Podge of Arguments Against Permitting a Carve Out and/or Addition of Express Language to an ANDA Label are Unpersuasive

Hospira and Sandoz also put forth a hodge-podge of other arguments that are of no merit.

First, Hospira suggests that by "gaining approval for a subset of an otherwise patented indication, the generic could then capture the market for *all* uses." (Hospira comments at p. 11 (emphasis in original.) If this comment is directed to the possibility of patent infringement, it has been repeatedly rejected by the Federal Circuit and the Supreme Court. *See AstraZeneca Pharms. LP v. Apotex Corp.,* 669 F.3d 1370, 1380 (Fed. Cir. 2012); *Warner-Lambert Co. v. Apotex Corp.,*316 F.3d 1348, 1364 (Fed. Cir. 2003); *see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* 132 S. Ct. 1670, 1681-82 (2012) ("[The Hatch-Waxman] statutory scheme, in other words, contemplates that one patented use will not foreclose marketing a generic drug for other

unpatented ones."). If Hospira's comment is directed to some concern other than patent infringement, it is similarly foreclosed by the very structure of the Act itself, because "the statute expresses the legislature's concern that the new generic be safe and effective for each indication that will appear on its label; whether the label for the new generic lists every indication approved for use of the pioneer is a matter of indifference." *Bristol-Myers Squibb Co. v. Shalala,* 91 F.3d 1493, 1500 (D.C. Cir. 1996). In other words, Congress and the courts have already spoken with respect to Hospira's concern, and rejected it.

Second, Hospira and Sandoz both express concern that allowing a section viii statement and corresponding carve out would be "unfair" to Sandoz because Sandoz should be entitled to first-to-file exclusivity resulting from its paragraph IV certification. However, there is nothing unfair resulting from Sandoz's own business decision to proceed in the manner it did. According to the tentative approval letter for Sandoz's ANDA posted at Drugs@FDA, Sandoz filed its ANDA application in April, 2009 – *after* both indications for Precedex had already been approved. Thus, the option of carving out the ICU indication was available to Sandoz, but it apparently chose not to do so, most likely because Sandoz wanted to be able to market its ANDA product for the ICU indication and wanted market exclusivity against other ANDA applicants for that indication. To do so, it needed to make a paragraph IV certification to the '867 patent rather than a section viii statement. Hospira spelled out Sandoz's rationale in this regard to the district court in its closing argument:

> [HOSPIRA'S COUNSEL]: As we know, Precedex had two indications approved by the FDA in 2008. When Sandoz came along and filed its application for generic approval with the FDA, it chose only to seek approval for the '867 patent [ICU] indication. It didn't ask the FDA even to have approval for that second [procedural] indication that their experts would say is responsible for sales growth of Precedex. Knowing that they infringed the '867 patent, they went ahead and copied that [ICU] indication itself. *This was in and of itself recognition that the '867 patent was something that Sandoz wanted on its label, Sandoz wanted as part of its sales of the product.*

(JHP's Jan. 24 comments, Ex. 6 at p. 2089 (emphasis added).) Sandoz's precise rationale for pursuing the course it did may not be public record. But it is clearly not "unfair" to hold Sandoz to its business decisions when it had the option to carve out protected aspects of the '867 patent, but did not do so.

Moreover, it would be "unfair" to the public to adopt the rationale propounded by Hospira and Sandoz. If that argument were accepted by the Agency to preclude carve outs when another ANDA applicant had previously made a paragraph IV certification, then any ANDA applicant could ensure first-to-file exclusivity and delay the entrance of competition otherwise permissible through carve outs simply by filing a paragraph IV certification instead of a section viii statement. This does not comport with the literal language or the intended purpose of the Act.

Third, Hospira suggests that if the Agency permits the addition of language with respect to the procedural indication here, a parade of horribles will ensue in which ANDA applicants seek to effectively propose new, heretofore unapproved indications. (Hospira comments at p. 12.) However, the Agency is fully capable of evaluating the safety and efficacy of proposed ANDA carve outs on an individual basis, and regularly does so. Assuming the Agency had a need to clarify the scope of the procedural indication here, there are no safety concerns with

11

clarifying that the procedural indication does not encompass an indication (the ICU indication) the Agency has already apparently decided can be carved out (based on Mylan's tentative approval). In any event, the majority of carve outs undoubtedly do involve simple word-for-word deletions, and that is likely to continue to be the case even if the Agency permits something else here.[13]

Finally, Hospira suggests the Agency is engaging in impermissible rulemaking in contravention of 5 U.S.C. § 553. (Hospira comments at p. 12.) This provision of the Administrative Procedure Act requires formal notice and comment rulemaking for "legislative" or "substantive" agency rulemaking, but it does not apply to "interpretive rules." *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1107-09 (D.C. Cir. 1993); *Hi-Tech Pharms., Inc. v. Crawford*, 505 F. Supp. 2d 1341, 1351 (N.D. Ga. 2007). "Substantive rules are those that implement statutes and have the force and effect of law[,]" whereas "'[i]nterpretive rules are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Id.* (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302, n.31 (1979)) (internal quotations omitted). An action is deemed to be a substantive rule when it repudiates or effectively amends a previous substantive rule. *Am. Mining Cong.*, 995 F.2d at 1109, 1112. "Interpretive rules do not require notice and comment rulemaking so long as the interpretation is within the scope of the regulatory and statutory language." *Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F.Supp. 2d 28, 38 (D.D.C., 2003) (citing *Am. Mining. Congr.*, 995 F.2d at 1113). Hospira contends that because permitting a carve out would contravene the Agency's longstanding practices, such an action is a substantive or legislative rule that requires extended notice and comment rulemaking.

Hospira is wrong. Here, an Agency decision permitting a carve out of a subset of an indication or allowing ANDA submitters who made section viii statements prior to Hospira's eleventh-hour submission of a new use code for the '867 patent to maintain those section viii statements would not contravene any longstanding practice but, rather, would be in *conformance* with the Agency's rules and the Act. To the extent such a decision would be announcing anything that could be considered "new," it would be to simply "advise the public of [the Agency's] construction of the statutes and rules which it administers" and would at most be an interpretive rule that is "within the scope of the regulatory and statutory language." Further, JHP agrees with Leydig, Voigt & Meyer (comments at p. 5) that the fact that participants in previous cases (or the Agency) may not have raised the precise issue addressed here, does not mean the Agency is powerless to apply the law in this situation—especially where, as discussed below, the Agency applies a reasoned analysis to its decision.

In sum, Hospira's and Sandoz's hodge-podge of policy arguments are not persuasive and should be rejected.

---

[13] The letter from members of Congress cited by Hospira is not germane here. On its face, the letter relates to a different issue and a different regulation that, according to the letter, would permit ANDA applicants to alter their ANDA labels without FDA approval.

## V.   The Agency is Well-Suited to Permit a Complete Carve Out of the ICU Indication in Accord With Use Code U-1472 Because the ICU Indication Does Not Overlap With the Procedural Indication

The Agency has requested comments on multiple possible scenarios, and JHP has responded here to many of these comments put forth by several different commenters. In the end, however, it is worth emphasizing the simple point that the Agency would be acting well within its authority and expertise to determine as a scientific matter that the ICU indication (approved in 1999) does not overlap at all with the procedural indication (approved in 2008) and thus the former indication can be carved out, while the latter indication can remain in the label, in accord with use code U-1472. "The FDA is to be accorded deference when it is evaluating scientific data within its technical expertise," *Bristol-Myers Squibb Co. v. Shalala*, 923 F.Supp. 212, 216 (D.D.C. 1996), as long as that decision is "the product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012). The comments herein as well as the comments by others such as Actavis, Hunton & Williams and Leydig, Voigt & Mayer—coupled with the Agency's own substantial knowledge and expertise—form the basis for a reasoned decisionmaking process supporting that determination.

### CONCLUSION

Thank you again for the opportunity to present JHP's views on these matters. Please contact me if you have any questions or require further information.

Sincerely,

Steve Richardson
Vice President, Scientific and Regulatory Affairs
JHP Pharmaceuticals

cc:   Dave Read
      Regulatory Counsel, Office of Generic Drugs
      david.read@fda.hhs.gov

## EXHIBIT LIST

10.   Hospira's Form 10-K for the Period ending Sept. 30, 2013, filed Nov. 6, 2013

11.   Public version of Sandoz trial brief in No. 09-cv-4591 (D.N.J.), filed May 17, 2012

12.   Sandoz Federal Circuit brief in No. 12-1426, filed Apr. 15, 2013

13.   Candiotti KA, *et al.,* Monitored anesthesia care with dexmedetomidine: a prospective, randomized, double-blind, multicenter trial, *Ambulatory Anesthesiology* 110(1): 47-56 (Jan. 2010).

14.   Bergese SD, *et al.,* A phase IIIb, randomized, double-blind, placebo-controlled, multicenter study evaluating the safety and efficacy of dexmedetomidine for sedation during awake fiberoptic intubation, *Am J Therapeutics* 17:586-595 (2010).

15.   Hospira press release Oct. 30, 2008

# Exhibit 4



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Silver Spring, MD 20993

ANDA 203972

Par Sterile Products, LLC
Attention: Sharif Ahmed
            Director, Regulatory Affairs
Building D, 3rd Floor
One Upper Pond Road
Parsippany, NJ 07054

Dear Sir:

This is in reference to your abbreviated new drug application (ANDA) for Dexmedetomidine
Hydrochloride Injection, 100 mcg (base)/mL, packaged in 200 mcg (base)/2 mL Single-dose Vials.

The Food and Drug Administration (FDA) is hereby notifying you that, pursuant to the temporary
restraining order (Case No.: GJH-14-02662) issued on August 19, 2014, by the United States
District Court for the District of Maryland, Southern Division, the decision in Docket No. FDA-
2014-N-0087 relating to this approval has been stayed, and FDA will not take additional action
based on that decision while the temporary restraining order remains in effect.   In addition, we
understand that you have suspended marketing your dexmedetomidine product while the order
remains in effect.  On August 20, 2014, the court temporarily stayed paragraphs 3 and 4 of the order.
FDA is therefore not taking action on those paragraphs.  This temporary restraining order expires on
September 2, 2014, unless extended.

If you have any questions regarding this letter, please contact David T. Read, Acting Deputy
Director, Office of Generic Drug Policy, Office of Generic Drugs, at 240-402-7943.

Sincerely yours,

*{See appended electronic signature page}*

CAPT Jason J.Y. Woo, M.D., M.P.H.
Acting Director, Office of Regulatory Operations
Office of Generic Drugs
Center for Drug Evaluation and Research

Enclosure:  Temporary Restraining Order

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |  |
|---|---|---|
| HOSPIRA, INC. | * | |
| | * | |
| **Plaintiff,** | * | |
| v. | * | Case No.: GJH-14-02662 |
| | * | |
| SYLVIA MATHEWS BURWELL, ET AL. | * | |
| | * | |
| **Defendants.** | * | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## ORDER

For the reasons stated in the Memorandum Opinion, it is hereby ORDERED that:

1. The August 18, 2014 decision of Defendant Food and Drug Administration ("FDA"), in Docket No. FDA-2014-N-0087 is hereby STAYED;

2. Any action which FDA is proposing to take in reliance upon its decision in Docket No. FDA-2014-N-0087 is similarly STAYED;

3. FDA is ORDERED to recall any product sold or distributed under such an approval; and

4. Any action which FDA has taken prior to the entry of this Order predicated upon the decision in Docket No. FDA-2014-N-0087 is hereby RESCINDED *ab initio*.

This Order shall continue in full force and effect until September 2, 2014, unless extended. The Court will convene a conference call with the parties on August 20, 2014 at 10:30 am to discuss scheduling of further motions. Counsel for Plaintiff is asked to initiate the call.

Dated: <u>August 19, 2014</u>

           <u>      /S/      </u>
George Jarrod Hazel
United States District Judge

-------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-------------------------------------------------------------------------------------------------

/s/

----------------------------------------------------

WILLIAM P RICKMAN
08/20/2014

Exhibit 5

Case 8:14-cv-02662-GJH   Document 117   Filed 09/04/14   Page 50 of 57

8/20/2014          www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Overview&DrugName=DEXMEDETOMIDINE HYDROCHLORIDE

FDA Home[3] Drug Databases[4] Drugs@FDA[5]



**FDA Approved Drug Products**

`Start Over`    `Back to Search Results`

FAQ[6]  |  Instructions[7]  |  Glossary[8]  |  Contact Us[9]

## Overview

| | |
|---|---|
| **Drug Name** | **DEXMEDETOMIDINE HYDROCHLORIDE** |
| **Active Ingredient(s)** | • DEXMEDETOMIDINE HYDROCHLORIDE |
| **Form(s) and** | • INJECTABLE; INJECTION: 100MCG ; 100MCG (base) /mL |
| **Strength(s) Available** | • INJECTABLE;INJECTION: EQ 200MCG BASE/2ML (EQ 100MCG BASE/ML) |

Details about drugs are organized by FDA Application Number (NDA or ANDA or BLA).

**Click on a drug name or application number to view drug details:**
**Click on a column header to re-sort the table:**

| Drug Name and FDA Application Number | Label Info | Dosage Form/Route | Strength | Marketing Status | Company |
|---|---|---|---|---|---|
| DEXMEDETOMIDINE HYDROCHLORIDE (ANDA # 091465) | Not Available | INJECTABLE; INJECTION | 100MCG | None (Tentative Approval) | SANDOZ |
| DEXMEDETOMIDINE HYDROCHLORIDE (ANDA # 202126) | Not Available | INJECTABLE; INJECTION | 100MCG | None (Tentative Approval) | CARACO |
| DEXMEDETOMIDINE HYDROCHLORIDE (ANDA # 202585) | Not Available | INJECTABLE; INJECTION | 100MCG (base) /mL | None (Tentative Approval) | AKORN INC |
| DEXMEDETOMIDINE HYDROCHLORIDE (ANDA # 202881) | Not Available | INJECTABLE;INJECTION | EQ 200MCG BASE/2ML (EQ 100MCG BASE/ML) | Prescription | MYLAN INSTITUTIONAL |
| DEXMEDETOMIDINE HYDROCHLORIDE (ANDA # 203972) | Not Available | INJECTABLE;INJECTION | EQ 200MCG BASE/2ML (EQ 100MCG BASE/ML) | Prescription | PAR STERILE PRODUCTS |

Back to Top | Back to Previous Page | Back to Drugs@FDA Home

Disclaimer[10]

FDA/Center for Drug Evaluation and Research
Office of Communications
Division of Online Communications
Update Frequency: Daily

---

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. http://www.fda.gov/default.htm

4. http://www.fda.gov/Drugs/InformationOnDrugs/default.htm

5. http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm

6. http://www.fda.gov/Drugs/InformationOnDrugs/ucm075234.htm

7. http://www.fda.gov/Drugs/InformationOnDrugs/UCM079874

8. http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm

9. http://www.accessdata.fda.gov/scripts/email/cder/commentdrugcat.cfm

10. http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/default.htm#web

11. http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/ViewingFiles/default.htm

12. http://www.fda.gov/AboutFDA/AboutThisWebsite/Accessibility/default.htm

Case 8:14-cv-02662-GJH   Document 117   Filed 09/04/14   Page 51 of 57

8/20/2014        www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Overview&DrugName=DEXMEDETOMIDINE HYDROCHLORIDE

13. http://www.fda.gov/AboutFDA/ContactFDA/default.htm

14. http://www.fda.gov/AboutFDA/WorkingatFDA/default.htm

15. http://www.fda.gov/AboutFDA/Transparency/Basics/default.htm

16. http://www.fda.gov/RegulatoryInformation/FOI/default.htm

17. http://www.fda.gov/AboutFDA/WorkingatFDA/NoFearAct/default.htm

18. http://www.fda.gov/SiteMap/default.htm

19. http://www.fda.gov/AboutFDA/Transparency/default.htm

20. http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/default.htm

21. http://www.fda.gov

22. http://www.fda.gov/AboutFDA/ContactFDA/default.htm

23. http://www.usa.gov

24. http://www.fda.gov/AboutFDA/ContactFDA/StayInformed/GetEmailUpdates/default.htm

25. http://www.fda.gov/AboutFDA/ContactFDA/StayInformed/RSSFeeds/default.htm

26. http://www.fda.gov/NewsEvents/InteractiveMedia/default.htm#micro

27. http://www.fda.gov/NewsEvents/InteractiveMedia/default.htm#Facebook

28. http://www.fda.gov/NewsEvents/InteractiveMedia/ucm200145.htm

29. http://www.fda.gov/NewsEvents/InteractiveMedia/default.htm#flickr

30. http://www.fda.gov/ForFederalStateandLocalOfficials/default.htm

31. http://www.fda.gov/NewsEvents/default.htm

32. http://www.fda.gov/CombinationProducts/default.htm

33. http://www.fda.gov/AdvisoryCommittees/default.htm

34. http://www.fda.gov/ScienceResearch/default.htm

35. http://www.fda.gov/RegulatoryInformation/default.htm

36. http://www.fda.gov/Safety/default.htm

37. http://www.fda.gov/EmergencyPreparedness/default.htm

38. http://www.fda.gov/InternationalPrograms/default.htm

39. http://www.fda.gov/NewsEvents/default.htm

40. http://www.fda.gov/Training/default.htm

41. http://www.fda.gov/ICECI/default.htm

42. http://www.fda.gov/ForFederalStateandLocalOfficials/default.htm

43. http://www.fda.gov/ForConsumers/default.htm

44. http://www.fda.gov/ForIndustry/default.htm

45. http://www.fda.gov/ForHealthProfessionals/default.htm

46. http://www.accessdata.fda.gov/scripts/search/index.cfm?action=archive.search

47. http://www.hhs.gov

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players[11].

Accessibility[12] Contact FDA[13] Careers[14] FDA Basics[15] FOIA[16] No Fear Act[17] Site Map[18] Transparency[19] Website Policies[20]

[21]
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA[22]

USA.gov [23]   [24]   [25]   [26]   [27]   [28]   [29]

For Government[30] For Press[31]

Combination Products[32] Advisory Committees[33] Science & Research[34] Regulatory Information[35] Safety[36] Emergency Preparedness[37] International Programs[38] News & Events[39] Training and Continuing Education[40] Inspections/Compliance[41] State & Local Officials[42] Consumers[43] Industry[44] Health Professionals[45] FDA Archive[46]

 U.S. Department of **Health & Human Services**[47]

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. http://www.fda.gov/default.htm
4. http://www.fda.gov/Drugs/InformationOnDrugs/default.htm
5. http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm
6. http://www.fda.gov/Drugs/InformationOnDrugs/ucm075234.htm
7. http://www.fda.gov/Drugs/InformationOnDrugs/UCM079874
8. http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm
9. http://www.accessdata.fda.gov/scripts/email/cder/commentdrugcat.cfm
10. http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/default.htm#web
11. http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/ViewingFiles/default.htm
12. http://www.fda.gov/AboutFDA/AboutThisWebsite/Accessibility/default.htm
13. http://www.fda.gov/AboutFDA/ContactFDA/default.htm
14. http://www.fda.gov/AboutFDA/WorkingatFDA/default.htm
15. http://www.fda.gov/AboutFDA/Transparency/Basics/default.htm
16. http://www.fda.gov/RegulatoryInformation/FOI/default.htm
17. http://www.fda.gov/AboutFDA/WorkingatFDA/NoFearAct/default.htm
18. http://www.fda.gov/SiteMap/default.htm
19. http://www.fda.gov/AboutFDA/Transparency/default.htm
20. http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/default.htm
21. http://www.fda.gov
22. http://www.fda.gov/AboutFDA/ContactFDA/default.htm
23. http://www.usa.gov
24. http://www.fda.gov/AboutFDA/ContactFDA/StayInformed/GetEmailUpdates/default.htm
25. http://www.fda.gov/AboutFDA/ContactFDA/StayInformed/RSSFeeds/default.htm
26. http://www.fda.gov/NewsEvents/InteractiveMedia/default.htm#micro
27. http://www.fda.gov/NewsEvents/InteractiveMedia/default.htm#Facebook
28. http://www.fda.gov/NewsEvents/InteractiveMedia/ucm200145.htm
29. http://www.fda.gov/NewsEvents/InteractiveMedia/default.htm#flickr
30. http://www.fda.gov/ForFederalStateandLocalOfficials/default.htm
31. http://www.fda.gov/NewsEvents/default.htm
32. http://www.fda.gov/CombinationProducts/default.htm
33. http://www.fda.gov/AdvisoryCommittees/default.htm
34. http://www.fda.gov/ScienceResearch/default.htm
35. http://www.fda.gov/RegulatoryInformation/default.htm
36. http://www.fda.gov/Safety/default.htm
37. http://www.fda.gov/EmergencyPreparedness/default.htm

38. http://www.fda.gov/InternationalPrograms/default.htm

39. http://www.fda.gov/NewsEvents/default.htm

40. http://www.fda.gov/Training/default.htm

41. http://www.fda.gov/ICECI/default.htm

42. http://www.fda.gov/ForFederalStateandLocalOfficials/default.htm

43. http://www.fda.gov/ForConsumers/default.htm

44. http://www.fda.gov/ForIndustry/default.htm

45. http://www.fda.gov/ForHealthProfessionals/default.htm

46. http://www.accessdata.fda.gov/scripts/search/index.cfm?action=archive.search

47. http://www.hhs.gov

# Exhibit 6





To assure proper viewing of this document please set overprint preview to "always" in your Adobe preferences.



Nosco®   691 S.W. King Jr Ave · Waukegan, IL 60085 · Phone 847.336.4200 · Fax 847.360.4524
1100 Venture Court · Suite 100 · Carrollton, Texas 75006 · Phone 972.478.6400 · Fax 972.478.6401

Proof #4
7/23/2014

Product Information
P/N: 2000391A-Component
JRL: 200392
Cust: JHP PHARMACEUTICALS LLC
Size: ×8.5 × ×18.
Die: 131177-O-10  Braille: NA
CR: NA

Special Instructions

Approved by:
Name
Date
☐ OK to Print   ☐ New Proof Required
We need two signed proof before we can begin production.

This proof is to show size, copy placement and color track. Actual colors will be matched on press to PMS Book, Or, Demand Solutions Four Color Book, Or, Demand Solutions Indichrome Plus Book and/or approved Color Standards.

To assure proper viewing of this document please set overprint preview to "always" in your Adobe preferences.

