**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **HOSPIRA, INC, ET AL.** | | |
| | * | |
| | | |
| **Plaintiffs,** | * | |
| **v.** | | **Case No.: GJH-14-02662** |
| | * | |
| **SYLVIA MATHEWS BURWELL, ET AL.** | | |
| | * | |
| **Defendants.** | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This is an action brought by Plaintiff Hospira, Inc. ("Hospira") along with Plaintiff-Intervenor Sandoz, Inc. ("Sandoz") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, challenging various actions taken by Defendant Food and Drug Administration ("FDA").[1]  Specifically, Hospira and Sandoz contend that the FDA's August 18, 2014 decision authorizing the approval of generic versions of the drug dexmedetomidine hydrochloride violated § 355(j)(2)(A)(viii) of the Drug Price Competition and Patent Term Restoration Act of 1984, commonly referred to as the "Hatch–Waxman Amendments." Additionally, Hospira and Sandoz contend that through its August 18, 2014 decision, FDA effected a change to settled law thereby adopting a new "rule" as defined by the APA, which was not promulgated in accordance with the formal rulemaking procedures required by the APA. Accordingly, Hospira and Sandoz sought a temporary restraining order and/or preliminary

---

[1] In addition to naming the FDA as a defendant, Hospira and Sandoz have also named Sylvia Mathews Burwell, Secretary of the U.S. Department of Health and Human Services, and Dr. Margaret Hamburg, Commissioner of the FDA, as defendants.  Because the allegations against these three defendants are the same, the Court will refer to them collectively as the "FDA."

injunction that, among other things, stayed the effect of the FDA's August 18, 2014 decision. Mylan Institutional, LLC ("Mylan") intervened.

On August 19, 2014, after an emergency hearing, the Court granted Hospira's and Sandoz's motions and issued a temporary restraining order that day.  After staying a portion of the Court's temporary restraining order, and then granting, in part, and denying, in part, Mylan's motion for reconsideration of the temporary restraining order, the Court consolidated the preliminary injunction motion with a final decision on the merits under Rule 65(a)(2) of the Federal Rules of Civil Procedure.  Accordingly, on August 29, 2014, all of the parties (except Sandoz) filed cross-motions for summary judgment.[2]

For the reasons stated below, the Court finds that the FDA's August 18, 2014 decision authorizing the approval of generic versions of Precedex® was not arbitrary, capricious, or otherwise not in accordance with law, but was instead based on a reasonable and sound interpretation of the relevant statute.  Additionally, the Court finds that the FDA's August 18, 2014 decision was entirely consistent with the FDA's established practice of approving generic drugs and therefore did not effect a change to settled law.  As such, no new "rule" was created by the FDA's decision and the FDA was therefore not required to follow the APA's formal rulemaking procedures.  Hospira's motion for summary judgment is therefore DENIED, and summary judgment is GRANTED in favor of the FDA, Mylan, and Defendant-Intervenor Par Sterile Products, LLC ("Par Sterile").

---

[2] Sandoz did, however, file an Opposition to the Defendants' Motions for Summary Judgment. *See* ECF No. 108.

## I.      Background

### A.      Statutory and Regulatory Framework

This case involves issues relating to the interpretation of the Hatch–Waxman Amendments, which substantially amended the Federal Food, Drug, and Cosmetic Act ("FDCA").  *See* Pub.L. No. 98–417, 98 Stat. 1585 (1984), *codified at* 21 U.S.C. § 355.  These complex amendments have been thoroughly explained by the District Court for the District of Columbia on numerous occasions.  *See  e.g.*, *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191, 193-96 (D.D.C. 2002) *aff'd*, 354 F.3d 877 (D.C. Cir. 2004); *Mylan Pharm., Inc. v. Sebelius*, 856 F. Supp. 2d 196, 199-201 (D.D.C. 2012); *Apotex Inc. v. Food & Drug Admin.*, 414 F. Supp. 2d 61, 63-64 (D.D.C. 2006) *aff'd*, 226 F. App'x 4 (D.C. Cir. 2007).  Given the parties' desire to have a swift resolution of this matter, and in the interests of judicial economy, the Court will forgo its opportunity to dissect the statutory and regulatory framework of the Hatch-Waxman Amendments and instead will rely on the thoughtful discussion from *Purepac Pharm. Co.*, 238 F. Supp. 2d at 193-96 that fully describes the statutory and regulatory regime implicated in this case.  The court in *Purepac Pharm. Co.* stated that:

> [The Hatch-Waxman] amendments were designed to simplify and expedite the process by which generic drugs are brought to market. Generally, a company seeking FDA approval to market a particular drug must file a lengthy document called a New Drug Application ("NDA"), which, among other things, must include detailed data establishing the drug's safety and effectiveness.  The NDA must also contain information on each patent that claims the drug or a method of using the drug that is the subject of the application and with respect to which a patent infringement claim could reasonably be asserted against a[n] unauthorized party.  21 U.S.C. § 355(b)(1); (c)(2).  The FDA publishes the patent information that it receives in a publication entitled "Approved Drug Products With Therapeutic Equivalence Evaluations," known in agency parlance as the "Orange Book." *See Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1079 (D.C. Cir. 2001); Terry G. Mahn, *Patenting Drug Products: Anticipating*

*Hatch–Waxman Issues During the Claims Drafting Process,* 54 FOOD & DRUG L.J. 245, 249–50 (1999).

Before the Hatch–Waxman Amendments were enacted, a firm that hoped to manufacture and sell a generic version of an already-approved drug was required to submit a new NDA complete with new safety and effectiveness data.  *See Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1063 (D.C. Cir. 1998). Obviously, this requirement imposed considerable burdens on would-be generic manufacturers, delaying and increasing the cost of bringing generic drugs to market.  In order to benefit consumers, the amendments altered this requirement, creating a streamlined procedure for the approval of generic drugs whereby the generic applicant is permitted to piggyback on the original NDA filed by the manufacturer of the brand-name drug (the so-called "pioneer" or "innovator" drug).  Under this new system, generic drugs may be approved through an Abbreviated New Drug Application ("ANDA"), which relies on the FDA's previous determination that the pioneer drug is safe and effective.  *See Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 675, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990) ("The ANDA applicant can substitute bioequivalence data for the extensive animal and human studies of safety and effectiveness that must accompany a full new drug application."). This allows applicants to avoid the costly and time-consuming process associated with NDAs, thus facilitating the approval and dissemination of low-costs generic drugs.  *See* H.R.Rep. No. 98–857 (Part I) at 14 (June 21, 1984).

At the same time, Congress sought to protect patent holders whose rights could be threatened by the marketing of generic versions of their patented innovations.  *See Am. Bioscience, Inc. v. Thompson,* 243 F.3d 579, 580 (D.C. Cir. 2001).  To this end, the Hatch–Waxman Amendments require that ANDAs contain specified information about the patents protecting the pioneer drug, including "the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."  21 U.S.C. § 355(b)(1). There are two means by which applicants may satisfy this requirement . . . .

First, in a situation in which the patent potentially implicated by the generic drug "claims the listed [*i.e.* FDA-approved] drug . . . or which claims a use for such listed drug for

which the applicant is seeking approval," the ANDA applicant is required to certify that the new drug will not infringe the patent and explain why it will not. 21 U.S.C. § 355(j)(2)(A)(vii). The statute provides four bases on which this certification may be made: (I) that the required patent information has not been filed; (II) that the patent has expired; (III) that the patent will expire on a date certain; or (IV) that the patent is invalid or will not be infringed by the drug for which approval is sought. *Id.* [The fourth option is commonly referred to as a "paragraph IV certification."]

When an ANDA includes a paragraph IV certification, the applicant must give notice of the filing both to the owner of the patent and to the holder of the NDA for the approved drug. The statute then provides a 45–day window during which the patent owner may bring suit against the generic applicant. If a suit is initiated, the FDA's approval of the ANDA is automatically stayed for 30 months, a period that can be lengthened or shortened by the court hearing the case if either party fails to "reasonably cooperate in expediting the action." 21 U.S.C. § 355(j)(5)(B)(iii). If, before the expiration of the 30–month stay, the court finds that the patent is invalid or would not be infringed by the new drug, the FDA's approval of the ANDA becomes effective on the date of that ruling. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l,* 256 F.3d 799, 802 (D.C. Cir. 2001). As an incentive to generic manufacturers willing to run the risk of defending against patent infringement actions, the statute provides that the first party to gain approval of an ANDA containing a paragraph IV certification is entitled to a 180–day period of market exclusivity. 21 U.S.C. § 355(j)(5)(B)(iv). During this "[e]denic moment of freedom from the pressures of the market," *Mova Pharm.,* 140 F.3d at 1064, the FDA may not allow any subsequent ANDAs for the drug in question to become effective, thus allowing the first mover to sell its drug without competition from other generic manufacturers. *See Mylan Pharm., Inc. v. Shalala,* 81 F.Supp.2d 30, 33 (D.D.C. 2000) ("In other words, no ANDA for the same generic drug product will be approved during those 180 days.").

As noted, however, the statute provides an alternative to a paragraph IV certification, known as a "section viii statement," which applies where the patent in question is a "method of use patent which *does not claim* a use for which the applicant is seeking approval under this subsection." 21 U.S.C. § 355(j)(2)(A)(viii) (emphasis [in original]). By regulation, the FDA has provided that these statements are to be used when "the labeling for the drug product for which the applicant is seeking

approval does not include any indications that are covered by the use patent" that has been submitted by the NDA holder.  21 C.F.R. § 314.94(b)(12)(iii)(A).   In such circumstances, the ANDA applicant need not file a patent certification under paragraphs I–IV; instead, the ANDA must include a statement that the method of use patent at issue does not claim the use of the drug for which the applicant is seeking approval.  *Id*; *see also Mylan Pharms., Inc. v. Thompson*, 139 F.Supp.2d 1, 6 (D.D.C. 2001), *rev'd on other grounds*, 268 F.3d 1323 (Fed. Cir. 2001).  An applicant proceeding by means of a section viii statement need not inform the patent owner of its application, and does not face an infringement action under 35 U.S.C. § 271(e)(2)(A) . . . or the automatic 30–month stay applicable to paragraph IV certifications should the owner decide to file an infringement action.  Thus, the FDA may approve a section viii application immediately, making it an attractive route for generic manufacturers, even though a section viii statement does not entitle a successful applicant to the 180–day period of exclusivity bestowed on paragraph IV applicants.

As the above description makes clear, the availability of section viii statements turns on whether the method of use patent covering the pioneer drug actually "claims" the use for which the ANDA applicant seeks to market the generic version of that drug.  To understand how this works requires a more detailed examination of the process by which patents claiming certain uses for drug products come to be registered with the FDA.  As already described, every NDA must contain patent information regarding the drug for which the applicant seeks approval.  21 U.S.C. § 355(b)(1).   By regulation promulgated on October 3, 1994, however, the FDA added a caveat to this statutory mandate: "For patents that claim a method of use, the applicant shall submit information only on those patents that claim indications or other conditions of use of a pending or approved application." 21 C.F.R. § 314.53(b).  Once the NDA is approved, the applicant then has 30 days in which to amend its patent submissions to ensure that they list only those patents "that claim[ ] the formulation, composition, or the specific indications or other conditions of use that have been approved." 21 C.F.R. § 314.53(c)(2)(ii).   If a patent for an approved drug is obtained after the NDA has been accepted, the owner must list the new patent information within 30 days after the patent is issued.  21 U.S.C. § 355(c)(2).  The FDA lists all of these patent submissions in the Orange Book.

*          *          *          *

6

> [T]he FDA does not take it upon itself to review the patent submissions it receives from NDA applicants and holders in order to determine whether they actually relate to approved drugs and uses.   Instead, the agency views its role as purely ministerial. Lacking the resources or the expertise to determine the validity or scope of patent claims, the FDA simply lists the patent information that it receives from brand manufacturers, expecting those parties to understand and abide by the regulatory mandates.   *See* Abbreviated New Drug Application Regulations, Patent and Exclusivity Provisions, 59 Fed.Reg. 50,338, 50,345 (Oct. 3, 1994) (hereinafter "ANDA Rulemaking"); Mahn, *supra,* at 250 (noting the FDA's "willingness to list in the Orange Book virtually any patent submitted by an NDA holder").

> Indeed, in formulating its regulations governing patent submissions, the FDA explicitly declined to establish "a mechanism for review of submitted patent information to determine, at least on a very general basis, applicability to the particular NDA in question." *ANDA Rulemaking,* 59 Fed. Reg. at 50,343; *see aaiPharma Inc. v. Thompson,* 296 F.3d 227, 243 (4th Cir. 2002) (upholding the FDA's "purely ministerial approach to the Orange Book listing process" as a reasonable interpretation of its statutory responsibilities).   The duty to ensure that the Orange Book only lists patents that actually claim approved drugs thus lies with NDA holders.  *See Watson Pharm. v. Henney,* 194 F.Supp.2d 442, 445–46 (D. Md. 2001) ("In making its decision to list a patent . . . it is entirely appropriate and reasonable for the FDA to rely on the patentee's declaration as to coverage, and to let the patent infringement issues play out in other, proper arenas, as is the clear intent of the Hatch–Waxman Amendments.").

*Purepac Pharm. Co.*, 238 F. Supp. 2d at 193-96 (D.D.C. 2002) (footnotes omitted).

### B.      Case-Specific Background

#### 1.      NDA Holder – Hospira

Dexmedetomidine hydrochloride, the drug product at issue in this case, is currently marketed and sold by Hospira under the brand name Precedex®.   The FDA has approved Precedex® for two uses, commonly referred to as "indications."   These indications include (1) "sedation of initially intubated and mechanically ventilated patients during treatment in an intensive care setting." (*i.e.*, Intensive Care Unit Sedation); and (2) "sedation of non-intubated

patients prior to and/or during surgical and other procedures." (*i.e.*, Procedural Sedation).   ECF No. 1 at ¶ 26.   The FDA-approved label for Precedex® includes "Intensive Care Sedation" and "Procedural Sedation" as two separate indications.   Additionally, the FDA-approved label for Precedex® indicates that these separate uses call for different dosages, provide different warnings regarding withdrawal, and describe different adverse event information.   Furthermore, the FDA-approved label for Precedex® reveals that there were separate clinical trials for "Intensive Care Unit Sedation" and "Procedural Sedation" that were considered by the FDA in granting Hospira's NDA.   Accordingly, Precedex® is FDA-approved as safe and effective for either "Intensive Care Sedation" or "Procedural Sedation."

Hospira has, over time, listed several patents covering Precedex®.   Today, only a method-of-use patent remains:   U.S. Patent No. 6,716,867 (the '867 patent), which expires on October 1, 2019.   Hospira originally listed the '867 patent in the Orange Book in May 2004 with the following use code (U-572):   "Intensive Care Unit Sedation."   In November 2008, Hospira listed U.S. Patent No. 5,344,840 (the '840 patent) with the following use code (U-912) in the Orange Book: "Sedation of nonintubated patients prior to and/or during surgical and other procedures."   The '840 patent, however, expired on September 6, 2011.   Thus, the '867 patent is the only patent at issue in this case.

### 2.    ANDA Sponsors – Sandoz, Mylan, and Par Sterile

This case also involves three ANDA sponsors:   Plaintiff-Intervenor Sandoz, who pursued generic Precedex® approval through the Paragraph IV certification process; and Defendant-Intervenors Mylan and Par Sterile who sought and obtained approval to market and sell generic Precedex® through a section viii statement.

### a.       Sandoz's Paragraph IV Certification

In April 2009, Sandoz submitted ANDA No. 91-465, seeking approval from the FDA to market a generic Precedex® product in the U.S. through a Paragraph IV certification under 21 U.S.C. § 355(j)(2)(A)(vii).  Sandoz's Paragraph IV certification claimed that Hospira's '867 patent was invalid, unenforceable, and/or would not be infringed by Sandoz's generic Precedex® product.  Sandoz's ANDA was the first ANDA referring to the Precedex® NDA that included a Paragraph IV certification, thereby entitling Sandoz to 180-days of generic market exclusivity against any subsequent ANDA filer with a Paragraph IV certification made before the '867 patent's expiration.  *See* 21 U.S.C. § 355(j)(5)(B)(iv).

Following the FDA's acceptance of Sandoz's ANDA, and pursuant to the Hatch-Waxman Amendments, Sandoz notified Hospira, the owner of the '867 patent, of its Paragraph IV certification.  Shortly thereafter, Hospira sued Sandoz for patent infringement in the District of New Jersey.  In December 2013, after more than three years of litigation, including a bench trial on the merits and full appellate briefing, Sandoz and Hospira entered into a settlement agreement under which Sandoz was permitted to market its generic Precedex® product in the U.S. no later than December 26, 2014.

### b.       Mylan's and Par Sterile's Section VIII Statements

Unlike Sandoz, who obtained generic market exclusivity for generic Precedex® by initiating the Paragraph IV ANDA process, several other generic manufacturers, including Mylan and Par Sterile, sought FDA-approval of generic Precedex® through section viii statements.  Specifically, on February 28, 2011, Mylan submitted ANDA No. 202881 seeking FDA-approval to market and sell Mylan's generic version of Precedex®.  With its submission of ANDA No. 202881, Mylan filed a patent certification and exclusivity information to the patents

listed in the Orange Book for Hospira's Precedex® NDA.  At the time Mylan submitted its ANDA, the patent information published by the FDA in the Orange Book associated the use code "Intensive Care Unit Sedation" with the '867 patent.  Mylan, however, did not seek to market its ANDA product for this use, so it submitted a section viii statement to the '867 patent. In doing so, Mylan carved out the listed use of, and all explicit references to, "Intensive Care Unit Sedation" from its proposed labeling for its ANDA products, leaving only references to "Procedural Sedation" (which is no longer protected by the '840 patent).

Similarly, on February 2, 2012, Par Sterile submitted its ANDA seeking FDA approval to market and sell its generic Precedex®.[3]  With its ANDA submission, Par Sterile, just like Mylan, filed a patent certification and exclusivity information to the patents listed in the Orange Book for Hospira's Precedex® NDA.  At the time Par Sterile submitted its ANDA, Hospira listed two Orange Book patents for its Precedex® product, U.S. Patent Nos. 4,910,214 ("the '214 patent") and the '867 patent covering "Intensive Care Unit Sedation."  Again, just like Mylan, Par Sterile's ANDA indicated that it was only seeking to sell generic Precedex® for "Procedural Sedation" and only after Hospira's '214 patent expired on January 15, 2014.  Accordingly, Par Sterile submitted a section viii statement carving out from its label all explicit references to "Intensive Care Unit Sedation."

### c.      The FDA's Actions

On March 4, 2013, the FDA tentatively approved Mylan's ANDA with its proposed labeling that omitted "Intensive Care Unit Sedation."  Specifically, Mylan agreed to carve out from its label any explicit reference to the "Intensive Care Unit Sedation" use, including references to dosage amounts, withdrawal symptoms, adverse reactions, and clinical studies

---

[3] The ANDA was submitted by JHP Pharmaceuticals, LLC, which was subsequently acquired and later changed its name to Par Sterile Products, LLC on February 26, 2014.

associated with "Intensive Care Unit Sedation."   Mylan did not receive final FDA-approval in March 2013 because Hospira's exclusivity under the '214 patent had not yet expired. Nevertheless, Mylan's tentative approval letter from the FDA stated that Mylan's ANDA – with the section viii statement – was ready for final approval on January 15, 2014.

On January 6, 2014, with the FDA's formal approval of Mylan's ANDA just days away, Hospira sought to amend the '867 patent use code from "Intensive Care Unit Sedation" to "Intensive Care Unit Sedation, including sedation of non-intubated patients prior to and/or during surgical and other procedures."   ECF No. 1 at ¶ 27.   According to Hospira, and of great significance, this amendment to its use code was meant to "clarify[] – without expanding" the original use code.   ECF No. 92-1 at 26-27 (citing Administrative Record FDA000090-91). Indeed, the amended use code had "exactly the same scope" as the previous use code for "intensive care unit sedation."   ECF No. 92-1 at 15 (citing Administrative Record FDA000101). Thus, in accordance with the ministerial manner in which the FDA implements patent use code information, the FDA changed the use code for the '867 patent use code on January 8, 2014 to reflect Hospira's changes.

In addition to its change to the '867's use code, Hospira also submitted to the FDA a formal request that it not approve any ANDAs containing section viii statements relating to generic Precedex®.   Skeptical of a pharmaceutical company's ability to delay generic approvals through over-broad amendments to its use codes, Congress passed 21 U.S.C. § 355(q)(1)(A), which requires a company that seeks to delay the approval of ANDAs to submit a special form of petition, known as a citizen's petition.   *See* 21 U.S.C. § 355(q)(1)(A).   Accordingly, on January 9, 2014, the FDA notified Hospira that it believed Hospira was required to submit a citizen's petition under 21 U.S.C.§ 355(q) so that any interested or affected party would have an

opportunity to comment in a public docket.  Hospira, however, did not file such a petition.  As a result, the FDA established its own public docket (FDA-2014-N-0087) on January 15, 2014, the purpose of which was to solicit comments on certain legal and regulatory issues pertaining to Precedex®.  To that end, the FDA issued a letter to ANDA sponsors seeking comments on (1) whether the new use code for the '867 patent precluded approvals of all ANDAs, or whether one could be approved notwithstanding the new use code;  and (2) whether ANDAs with existing section viii statements for the previous '867 use code could retain those statements.  *See* ECF No. 2-3 at 2.

In response to its letter, the FDA received an initial set of comments on January 24, 2014, and a final set of comments on January 31, 2014.  In addition to receiving comments from NDA and ANDA sponsors, as well as various industry organizations, the FDA conducted its own labeling review and concluded the Mylan's generic label appropriately "carve[d] out ICU sedation use" and was safe and effective for the remaining "Procedural Sedation" indication.  ECF No. 94-1 at 12 (citing Administrative Record FDA000959).  Additionally, the FDA's Office of Generic Drugs requested a consult from the FDA's Division of Anesthesia, Analgesia, and Addiction Products regarding Hospira's ability to carve out information regarding the "Intensive Care Unit Sedation" indication from the label for Precedex®, without affecting the safety and efficacy for the "Procedural Sedation" indication.  In a memorandum to the FDA, Dr. Amelia Luckett, an anesthesiologist and clinical reviewer for the FDA's Center for Drug Evaluation and Research, found that "[n]one of the language explicitly related to intensive care unit (ICU) sedation was incorporated into the Mylan Dexmedetomidine Hydrochloride Injection package insert."  *Id.* (citing Administrative Record FDA000979).

Hospira also commented on the FDA's public docket.  According to Hospira, its new use code covered the first indication for intensive care unit sedation "in its entirety," and it also partially overlapped with the second indication – "sedation of non-intubated patients prior to and/or during surgical and other procedures" – "to the extent such sedation occurred in an ICU." ECF No. 92-1 at 15 (citing Administrative Record FDA009295).  Hospira also submitted evidence that doctors had used Precedex® for procedures in the ICU, and argued that such use meant that ANDA sponsors could not submit section viii statements to carve out the second indication, citing dicta from the Supreme Court's decision in *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1677 (2012) that the FDA "will not approve such an ANDA if the generic's proposed carve-out label overlaps at all with the brand's use code." *Id.*

After reviewing the statutory and regulatory framework governing patent protection for NDAs, as well as the numerous comments it received from various doctors and entities, the FDA determined, in a fifteen-page letter, that under either Hospira's original *or* amended use code, the FDA could approve an ANDA with a section viii statement carving out all references to the use protected by the '867 patent – "Intensive Care Unit Sedation."  *See* ECF No. 2-3 at 10. According to the FDA:

> Both the original and the revised use codes are limited to "intensive care unit sedation." Although the revised use code includes additional language specifying some of the types of patients that Hospira claims are encompassed within the "intensive care unit sedation" use, *i.e.*, non-intubated ICU patients prior to and/or during surgical and other procedures, it does not broaden the claimed method of use beyond "intensive care unit sedation."

*Id*.  The FDA specifically rejected Hospira's argument that it could not approve ANDAs for broad indications that may partially overlap with a protected method of use.  *Id.*  According to the FDA, "so long as any express references to the protected use are omitted from the labeling,"

the FDA "can approve ANDAs for broad, general indications that may partially overlap with a protected method of use." *Id*.  The FDA determined that because the ANDA's labeling did "not impermissibly disclose the use of Precedex® for procedures in the ICU," the protected use code was adequately carved out and ANDAs "may be approved for the second indication." *Id.*

The FDA's letter then went on to discuss examples of previous situations in which it allowed similar carve-outs over innovator objections for repaglinide, tramadol, and oxandrolone. *See id.* at 10-13.  Accordingly, on August 18, 2014, the FDA authorized the approval of ANDAs for Mylan's and Par Sterile's generic versions of Precedex®.  It is undisputed that in making this decision the FDA did not follow the formal rulemaking procedures required by § 553(b)-(d) of the APA when the FDA issues a new rule.

### C.      Procedural Background

Almost immediately after the FDA issued its August 18, 2014 decision permitting ANDA sponsors to sell and market generic versions of Precedex®, Hospira filed a complaint and motion for temporary restraining order and/or preliminary injunction in this Court seeking, among other forms of relief, to stay the effect of the FDA's decision.  *See* ECF Nos. 1, 2.  Hospira argued that, as a consequence of the FDA's decision, generic versions of Precedex® would begin to flood the market leaving Hospira without an adequate remedy.  *See* ECF No. 2 at 2.  Specifically, Hospira claimed that it would be harmed the moment of generic product launch; that the harm would be irreparable; and that the irreparable harm could only be avoided through a temporary restraining order and/or preliminary injunctive relief.  *Id.*  Given the urgent nature of Hospira's motion, the Court held an emergency hearing on August 19, 2014 to address Hospira's arguments.  *See* ECF No. 21.

At the hearing, the Court heard oral argument from all of the parties, except Par Sterile who did not intervene in this matter until following the ruling on the temporary restraining order.[4]   The next day the Court conducted a telephone conference between all of the parties, during which Mylan sought and was granted a stay of two paragraphs of the temporary restraining order pending the filing of and the Court's ruling on a motion for reconsideration. Mylan, along with Par Sterile, then sought full reconsideration and rescission of the temporary restraining order.   Following expedited briefing on the motions for reconsideration, the Court held a hearing on August 26, 2014, during which the Court granted partial reconsideration and entered a modified order.

On August 26, 2014, pursuant to Fed.R.Civ.P. 65(a)(2), the Court advanced final proceedings on the merits of Hospira's complaint and consolidated those proceedings with the hearing on Hospira's motion for a preliminary injunction.   Accordingly, on August 29, 2014, all of the parties (except Sandoz) filed cross-motions for summary judgment.   *See*   ECF  Nos.  92, 93, 94, 96.   The Court held a hearing on the cross-motions for summary judgment on September 4, 2014.   This Memorandum and Opinion addressees the parties' summary judgment motions. For the reasons discussed below, the Court will GRANT the summary judgment motions filed by the FDA, Mylan, and Par Sterile and will DENY the summary judgment motion and motion for preliminary injunction filed by Hospira.

---

[4] Although all parties were permitted to present oral argument, given the emergency nature of the hearing, only Hospira had the opportunity to submit a brief prior to the hearing on the temporary restraining order.   On that record, the Court "at [that] juncture" found that Hospira would likely succeed on the merits of this case and had successfully established the remaining requirements for issuance of the temporary restraining order.   *See* ECF No. 19 at 6.   Full and comprehensive briefing by all parties and review of the administrative record have now formed a complete record upon which the Court bases this ruling.

**II.      Standard of Review – Summary Judgment and the Administrative Procedures Act**

Under Fed.R.Civ.P. 56(a), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  In a case involving review of a final agency action under the APA, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record.  *See Roberts v. United States*, 883 F.Supp.2d 56, 62-63 (D.D.C. Mar. 23, 2012); *Kaiser Found. Hosps. v. Sebelius*, 828 F.Supp.2d 193, 197-98 (D.D.C. 2011).   Summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.  *See Richard v. INS,* 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977).  Thus, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Kaiser Found. Hosps.*, 828 F.Supp.2d at 198 (internal quotations and citations omitted).

Under the APA, the Court shall "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  In evaluating agency decision making under the APA, the Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens of Overton Park v. Volpe,* 401 U.S. 402, 416 (1971), *abrogated on other grounds, Califano v. Sanders,* 430 U.S. 99 (1977).  The scope of review "under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42–43 (1983).  Furthermore, administrative actions

are presumed valid; thus, a "court will not second guess an agency decision or question whether the decision made was the best one." *C & W Fish Co. v. Fox,* 931 F.2d 1556, 1565 (D.C. Cir. 1991). The APA only requires the Court to decide whether the agency "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 105 (1983) (citations omitted).

## III.   Discussion

### A.   Count 1 – Violation of 21 U.S.C. § 355(j)(2)(A)(viii)

Hospira claims that the FDA's August 18, 2014 decision authorizing the approval of generic versions of Precedex® was "arbitrary, capricious . . . or otherwise not in accordance with law." ECF No. 1 at ¶ 47. Hospira's argument boils down to a challenge to the FDA's interpretation of 21 U.S.C. § 355(j)(2)(A)(viii) ("section viii"). Specifically, Hospira argues that the FDA ignored the "[c]lear statutory language" (ECF No. 93-1 at 14) of section viii by "approv[ing] ANDAs where 'the generic's proposed carve-out label overlaps [some] with the brand's use code.'" *Id.* at 17. Ordinarily, a court reviews "an agency's construction of the statute which it administers" under the familiar two-step process of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).

### 1.   *Chevron* – Step One

As the Fourth Circuit has explained, the first step in the *Chevron* analysis is to ask whether "Congress has directly spoken to the precise question at issue," such that "the intent of Congress is clear." *Nat'l Elec. Mfrs. Ass'n v. Dept. of Energy*, 654 F.3d 496, 504 (4th Cir. 2011) (quoting *Chevron*, 467 U.S. at 842–43). If it is, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the

specific issue," *Id.* at 843, Congress has not spoken clearly, and a permissible agency interpretation of the statute merits judicial deference. Thus, "[t]he objective of *Chevron* step one is not to interpret and apply the statute to resolve a claim, but to determine whether Congress's intent in enacting it was so clear as to foreclose any other interpretation." *King v. Burwell*, Case No. 14-1158, 2014 WL 3582800, at *5 (4th Cir. July 22, 2014) (citing *Grapevine Imports, Ltd. v. United States*, 636 F.3d 1368, 1377 (Fed. Cir. 2011)).

Under the first step of *Chevron*, "a reviewing court is to 'employ [ ] traditional tools of statutory construction' to determine whether Congress addressed 'the precise question at issue.'" *Nat. Elec. Mfrs. Ass'n.*, 654 F.3d at 504 (quoting *Chevron*, 467 U.S. at 842, 843 n. 9). Thus, courts begin this analysis with the text and structure of the statute. *Id.* (citing *Cabell Huntington Hosp. Inc. v. Shalala*, 101 F.3d 984, 986 (4th Cir. 1996)). After all, "the plain language of the statute" is "the most reliable indicator of Congressional intent." *Schafer v. Astrue*, 641 F.3d 49, 54 (4th Cir. 2011). Additionally, the Fourth Circuit has "described legislative history as one of the traditional tools of interpretation to be consulted at *Chevron*'s step one." *Nat. Elec. Mfrs. Ass'n.*, 654 F.3d at 504-05 (citing *Elm Grove Coal Co. v. Dir., O.W.C.P.*, 480 F.3d 278, 293-94 (4th Cir. 2007)).

Thus, the Court begins its *Chevron* step one inquiry into Congress's intent, as it must, from "the fundamental canon that statutory interpretation begins with the language of the statute itself." *Butler v. West*, 164 F.3d 634, 639 (D.C. Cir. 1999). Here, the relevant statute is 21 U.S.C. § 355(j)(2)(A)(viii), which describes the statement an ANDA applicant must submit to the FDA when the applicant wants to market a drug for less than all of the protected uses. In relevant part, the statute states:

> [I]f with respect to the listed drug . . . information was filed [by the brand manufacturer] . . . for a method of use patent which does not

claim a use for which the [ANDA] applicant is seeking approval under this subsection, [the applicant's ANDA shall contain] a statement that the method of use patent does not claim such a use.

21 U.S.C. § 355(j)(2)(A)(viii).

Despite Hospira's acknowledgment at the hearing on the temporary restraining order that the language of section viii is "not the greatest language in the world," ECF No. 61 at 21:21-22:14, Hospira now contends in its cross-motion for summary judgment that "[t]here is no ambiguity in the statute."  ECF No. 93-1 at 15.  Stretching the text of the statute in hopes of avoiding the deference the FDA enjoys under *Chevron* step two, Hospira contends that § 355(j)(2)(A)(viii) requires the FDA to reject a section viii statement "if any indication or indications in the generic's proposed label overlap 'at all' with the brand's use code as published in the Orange Book . . . ."  ECF No. 93-1 at 8.

To the contrary, however, the statute does not speak to the "precise question at issue" before this Court.  *Chevron*, 467 U.S. at 842.  That is, the statute does not address what constitutes "overlap" between an NDA holder's "use code" and an ADNA sponsor's "carved-out label."  Nor does the statute address the extent of "overlap" that may (or may not) be permissible between an ANDA's label and the NDA holder's use code.  Nor does the statute describe how the FDA is to determine whether a particular patent does not "claim a use" for which the ANDA applicant is seeking approval.  Nor does the statute address whether an ANDA with proposed labeling that does not seek approval for a protected use may be approved for the remaining non-protected conditions of use if the NDA has submitted evidence that it is foreseeable that the generic drug will be used for a protected use.  Indeed, the words "overlap," "at all," "use code," and "carve out" are not even included in the relevant statutory language.   Thus, the statute is hardly clear on this precise issue.  And Hospira's reliance on *Purepac Pharm. Co.*, 238 F. Supp.

2d at 204 for the proposition that "the language of section viii is quite clear" is unpersuasive. ECF No. 93-1 at 16. *Purepac*'s observation about the statutory language arose in a different context that did not involve the overlap issues raised by section viii in this case. *See Purepac Pharm. Co.*, 238 F. Supp. 2d at 204. Furthermore, Hospira has not identified any legislative history in support of its construction, nor has it pointed to another statutory provision which, when read in tandem with section viii, compels Hospira's construction of the statute.   Under these circumstances, it cannot be said that the statute speaks to the "precise question at issue" before the Court. *Chevron*, 467 U.S. at 842.

To bolster its contention that the statute is clear, Hospira directs the Court's attention to the "FDA's past position[s]" on this issue.  ECF No. 106 at 4.  Specifically, Hospira argues that the language of section viii is clear because, in an unrelated litigation dealing with section viii, the FDA did not claim that section viii was ambiguous.   Additionally, Hospira argues that statements the government made on behalf of the FDA in a Supreme Court *amicus curiae* brief purporting to interpret the Federal Register show that section viii is clear and unambiguous.  At *Chevron* step one, however, the Court *alone* is tasked with determining Congress's unambiguous intent.  As such, the Court must do so without showing the agency any special deference.  *See Board of Governors, FRS v. Dimension Fin. Corp.*, 474 U.S. 361, 368 (1986) (at *Chevron* step one a court focuses purely on statutory construction without according any weight to the agency's position because "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress"); *see also Bensman v. Nat'l Park Serv.*, 806 F. Supp. 2d 31, 41 (D.D.C. 2011) ("At this stage [*Chevron* step one], courts afford an agency's interpretation no special deference.").  Accordingly, the "FDA's past position[s]" (ECF No. 106 at 4) as expressed in other court proceedings are not pertinent to the Court's *Chevron*

step one analysis, especially where, as here, the statute does not speak to the precise question at issue.

### 2.  *Chevron* – Step Two

Finding that Congress has not "directly spoken to the precise question at issue," the Court moves to *Chevron*'s second step.  *Chevron*, 467 U.S. at 842.  At step two, the Court asks whether the "agency's [action] is based on a permissible construction of the statute." *Id.*  The Court may overturn the FDA's interpretation under *Chevron* step two only if the statute "unambiguously foreclosed the agency's statutory interpretation." *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 35 (D.C. Cir. 2009).  Thus, the Court will not "usurp an agency's interpretive authority by supplanting its construction with our own, so long as the interpretation is not 'arbitrary, capricious, or manifestly contrary to the statute.'"  *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 290 (4th Cir. 2013) (quoting *Chevron*, 467 U.S. at 844, 845).  "A construction meets this standard if it 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.'"  *Id.*  Courts have been clear that "[r]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid."  *Ohio Vall. Envt'l Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

Moreover, an agency's construction of its own regulations is entitled to "substantial deference," *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) and is accorded "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.*  Broad deference to an agency is especially appropriate where, as here, "a complex and highly technical regulatory program" is concerned, requiring "significant expertise" and the "exercise of judgment grounded in policy concerns." *Id.* (citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).  In these circumstances, the reviewing court should be particularly zealous in

guarding the agency's discretion.  *See Baltimore Gas & Elec. Co.*, 462 U.S. at 103 (holding that "[w]hen examining . . . [a] scientific determination . . . a reviewing court must generally be at its most deferential").   The Court "must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality."  *Am. Paper Inst. v. U.S. E.P.A.*, 660 F.2d 954, 963 (4th Cir. 1981) (citing and quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc).

Here, Hospira invites the Court to ignore this heightened standard of deference claiming that the FDA is "entitled to little, if any, deference because of the agency's severe lack of consistency in its interpretation of section viii."  ECF No. 106 at 4 (citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 698 (1991) (among other cases)).   Specifically, Hospira contends that the "FDA's decision to authorize approval of an ANDA in the face of clear overlap between the generic's proposed carve-out label and Hospira's use code" is inconsistent with the FDA's past practice and therefore entitled to "little" deference.   ECF No. 93-1 at 28. To demonstrate this purported inconsistency, Hospira relies principally on one sentence made by the government on behalf of the FDA in a Supreme Court *amicus curiae* brief purporting to interpret the Federal Register.  That statement reads:

> FDA will not approve an ANDA with a section viii statement if there is any overlap between the methods of using the drug reflected in (1) the carved-out labeling proposed in the ANDA, and (2) the use code in the Orange Book. *See* 68 Fed. Reg.36,682-36,683 (2003).

Ultimately, the substance of the above-referenced quote made its way into the Supreme Court's unanimous opinion in *Caraco* in which the Court stated, in dicta, that "the FDA will not approve such an ANDA if the generic's proposed carve-out label overlaps at all with the brand's use

code.  *See* 68 Fed. Reg. 36682-36683 (2003)."  *Caraco*, 132 S. Ct. at 1677.  Thus, Hospira

contends that at the time of the *Caraco* decision, it was the FDA's "rule" that "if any indication

or indications in the generic's proposed label overlap[ped] 'at all' with the brand's use code as

published in the Orange Book, the FDA must reject a section viii statement."  ECF No. 93-1 at 8

(citing *Caraco*, 132 S. Ct. at 1677).  Because the FDA's August 18, 2014 decision authorized the

approval of "generics seeking approval for an indication that overlaps with Hospira's use code,"

Hospira contends that the FDA acted inconsistently with the statute and regulations.  ECF No.

106 at 4.

The  Court  rejects  Hospira's  *Caraco*  argument  for  at  least  three  reasons:    first,

notwithstanding the government's statement in *Caraco*, the FDA has been consistent in how it

has interpreted section viii; second, Hospira's reading of the *Caraco* dicta would turn the *holding*

of *Caraco* on its head; and, third, there is simply no overlap between the ANDA's carved-out

labels and Precedex®'s use code (original or amended).

The FDA, pursuant to §355(j)(2)(A)(viii), has the authority to approve generic drugs that

"carve out" a particular method of using the drug from its label.  In doing so, an ANDA may

submit a section viii statement acknowledging that a given method-of-use patent has been listed,

carving out from its labeling information that corresponds to the use code description that the

NDA holder has provided, and stating that the patent at issue "does not claim a use for which the

applicant is seeking approval."  21 U.S.C. § 355(j)(2)(A)(viii).  Additionally, the FDA has

promulgated an implementing regulation that states:

> [T]he [generic] applicant shall submit a complete archival copy of
> the [ANDA] that includes the following:
>
> > (12) Patent Certification...

> (iii) Method of use Patent. (A) If patent information is submitted . . . for a patent claiming a method of using the listed drug, and the labeling for the drug product for which the applicant is seeking approval does not include any indications that are covered by the use patent, a statement explaining that the method of use patent does not claim any of the proposed indications.

21 C.F.R. §314.94(a)(12)(iii).  Based on its interpretation of the statute and the regulations, the FDA has consistently "determined that it can approve [section viii] ANDAs for broad, general indications that may partially overlap with a protected method of use, so long as any express references to the protected use are omitted from the labeling."  ECF No. 2-3 at 10.  Indeed, the FDA's August 18, 2014 decision discusses several of these situations.  In pertinent part, the decision states:

> For generic tramadol, for example, FDA allowed ANDAs to carve out a protected titration schedule that was based on a study analyzing the narrow question of the tolerability of the drug in patients who had previously been shown to be tramadol-intolerant and be approved with a broad indication for "management of moderate to moderately severe pain." *In that decision, FDA concluded that information specific to the titration schedule could be carved out without rendering the product less safe or effective for the non-protected conditions of use, even though that tramadol-intolerant sub-population may be part of the larger population for which the product is prescribed*. In the case at hand, we similarly conclude that ANDAs omitting references to the protected use in an intensive care unit may be approved for the procedural indication. The procedural indication, like the broad indication for "treatment of moderate to moderately severe pain" in the tramadol example, could potentially be practiced in a manner that would implicate a protected use, but approval for the indication is not foreclosed by such a possibility.

> Similarly for generic oxandrolone, FDA allowed ANDAs to carve out information on the label related to geriatric use for which the innovator had gained three years of exclusivity. In that case, the agency concluded that generic oxandrolone products would be as safe and effective as the RLD Oxandrin for all of the approved indications if the new geriatric use information were

> omitted, because the concerns addressed in the new Oxandrin geriatric labeling were adequately addressed by the labeling applicable to all adults, including the geriatric population. ***The agency did not explicitly limit or disclaim use in geriatric patients for these indications, and allowed the labeling carve out only of information that was explicitly related to geriatric use, not to general information that might pertain to geriatric patients.*** Here, while it is possible that procedural sedation might be administered in an ICU, an ANDA will be fully labeled for the procedural sedation indication regardless of where the sedation occurs and the omission of information regarding ICU sedation does not render this product any less safe or effective for the remaining non-protected conditions of use.

ECF No. 2-3 at 12-13 (emphases added).

The FDA's handling of the approval of generic tramadol and generic oxandrolone is entirely consistent with the way the FDA handled the approval of generic Precedex®.  That is, just as the FDA concluded that a labeling carve out was proper for tramadol and oxandrolone notwithstanding the fact that a physician might conceivably use the generic drug for a protected method of use, the FDA, here, concluded that ANDAs for Precedex® may also carve out the protected information (related to use for ICU sedation), and be approved for procedural sedation despite the fact that use for procedural sedation may at times occur in the intensive care unit. Accordingly, the FDA has not been inconsistent with its past practice.  To the contrary, the FDA has consistently "approve[d] ANDAs for broad, general indications that may partially overlap with a protected method of use, so long as any express references to the protected use are omitted from the labeling."  *Id.* at 10.  That is exactly what the FDA did here.  As such, the Court will decline Hospira's invitation to deny the FDA the heightened level of deference it is afforded under *Chevron* step two.

Under this "highly deferential standard," *Ohio Vall. Envt'l Coalition*, 556 F.3d at 192, the Court is unable to conclude that the FDA's interpretation of section viii in the August 18,

2014 decision was not "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842.  As discussed, the FDA has, on several occasions, approved section viii ANDAs for broad, general indications that may partially overlap with a protected method of use, so long as any express references to the protected use are omitted from the labeling.  None of these approvals have ever been found to be in violation of section viii of the Hatch-Waxman Amendments.[5]

Furthermore, Hospira's extensive reliance on a single sentence of dicta from *Caraco* about a different type of "overlap" does not control the outcome here.  In fact, when looked at more closely, *Caraco* actually supports the FDA's actions here.  To fully appreciate the import of *Caraco*, the Court must provide some context about that case and its history.  Long before the case ever reached the Supreme Court, the facts giving rise to the action were brewing at the administrative level when the FDA approved a single indication for repaglinide, an anitdiabetic drug sold under the brand name Prandin® by Novo Nordisk ("Novo").  *See* ECF No. 2-3 at 10. In 2008, the FDA approved repaglinide for a single indication – "as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus."  ECF No. 2-3 at 10.  Following its approval of the single indication, Novo petitioned the FDA to refrain from approving any ANDA for a repaglinide product, asserting that there was no longer a separate indication for metformin combination therapy that could be carved out, and that FDA's only option was to omit the entire indication (which partially overlapped with the protected use) or to require ANDA applicants to change from section viii statements to paragraph IV certifications (and omit nothing at all).  *Id.*  The FDA rejected this argument, noting that "[s]ection 505(j)(2)(a)(viii) of the Act refers to 'a use' for which the applicant is seeking approval."  *Id.* at

---

[5] It must also be noted that despite being asked on several occasions to provide the Court with examples of situations where the FDA interpreted section viii in a manner consistent with its preferred approach, and thus inconsistent with FDA's approach in the instant manner, Hospira's counsel was unable to provide any examples.  *See* ECF No. 86 at 73:10-74:16.

11.   Accordingly, the FDA determined that "it could approve an ANDA with all explicit references to use of repaglinide in combination with metformin carved out from the labeling; the ANDAs would be approved for the entire indication (as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus) with the combination metformin information removed from the ANDA labeling in sections where such combination use was mentioned expressly."   *Id*.

The FDA made this decision even though the scope of the broad indication was silent as to the methods for treating diabetes, and it was possible that a doctor might prescribe the drug for the protected use, *i.e.*, in combination with metformin to treat diabetes.   *See id*.   Because any information protected by the patent as described in the use code (metformin combination therapy) was not expressly disclosed by the indication (and omission of protected information would not result in a less safe or effective drug), the FDA determined that ANDAs carving out the protected information were approvable.   *See id*.   Thus, the FDA advised one of the generic applicants, Caraco Pharmaceuticals Laboratories ("Caraco") that if it did not seek to market repaglinide for use with metformin, it could submit a section viii statement.   *See id*. Doing so would allow Caraco to market its generic drug for the other two uses.   *See id*.   Thus, in 2008, Caraco submitted a section viii statement, with proposed labeling carving out explicit references to Novo's patented metformin therapy.

Before the FDA could take further action, however, "Novo changed its use code for the '358 patent."   *Caraco Pharm. Labs., Ltd.*, 132 S. Ct. at 1679.   Novo's new use code described "[a] method for improving glycemic control in adults with type 2 diabetes."   *Id*.   "Because that code indicates that the '358 patent protects all three approved methods of using repaglinide to treat diabetes, Caraco's proposed carve-out of metformin therapy was no longer sufficient; even

with that exclusion, Caraco's label now overlapped with Novo's use code on the other two uses." *Id.* "And Caraco could not carve out those uses as well, because at that point nothing would be left for it to market." *Id.* "The FDA had approved repaglinide for only three uses, and Novo's use code encompassed them all." *Id.* Accordingly, the FDA informed Caraco that it could no longer employ section viii to bring its drug to market. In response, Caraco filed a counterclaim in a related patent infringement action, seeking a determination that Novo's new use code was overly broad. Novo challenged Caraco's ability to raise such a counterclaim. Ultimately, the case reached the Supreme Court as *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670 (2012) in which the Court held that Caraco could challenge the breadth of Novo's use code by filing a counterclaim in patent infringement litigation.

Focusing on the facts and circumstances prior to Novo's use code amendment, it is quite similar to the situation presented here; that is, in both situations, the use codes were narrower than the approved indication, and the ANDA proposed labeling carved out the protected use. However, unlike the post-amendment labeling in *Caraco* which greatly expanded Novo's use code, the use code here would not create a similar complete and express overlap with the ANDA labeling because the ANDA's use code (original or amended) is concededly limited to intensive care unit sedation. Accordingly, in *Caraco*, there was not "sufficient space" for a carve-out label because there was only a single approved indication in Novo's branded label, which matched Novo's amended use code verbatim. Here, on the other hand, the FDA found that "sufficient space exists; FDA can approve ANDAs with only the second procedural indication and related information in the labeling without disclosing the protected use." ECF No. 2-3 at 12; *see Caraco Pharm. Labs., Ltd.*, 132 S. Ct. at 1677 ("Only if the use code provides sufficient space for the generic's proposed label will the FDA approve an ANDA with a section viii statement."). Thus,

the "overlap" discussed in *Caraco* concerned a complete and coextensive overlap between a broadened use code with a single indication.

This complete and coextensive overlap referenced in *Caraco* is quite different from the "overlap" inquiry presently before the Court.  Here, the relevant "overlap" inquiry concerns the overlap between the NDA's use code and the ANDA's proposed labeling.  Thus, in evaluating generic Precedex® applications, the FDA focused on identifying overlap between Hospira's protected use code and the ANDAs approved use as described in their labels.  In doing so, the FDA assessed the ANDAs proposed carve out, and in exercise of its scientific judgment, determined that there was no reference to the protected method of use – Intensive Care Unit Sedation – on the proposed generic label, regardless of the fact that some physicians might use the generic product in the ICU at some point in the future.  As such, the FDA determined that, consistent with past practice, it could approve the section viii ANDAs for broad, general indications even though they may partially overlap with a protected method of use, since all express references to the protected use were omitted from the labeling.  *See* ECF No. 2-3 at 10.

Furthermore, the FDA argues and the Court agrees that the "FDA has not acknowledged 'overlap in fact' between the proposed labeling and the protected use, as Hospira asserts, but only the possibility of use, which is very different."  *See* ECF No. 65 at 17-18 (claiming an overlap because Mylan's product "may at times" be used in the ICU – not that Mylan's label says that it *will* be used in the ICU).  Thus, Hospira's argument boils down to what doctors *may* do with generic Precedex®.  For purposes of the "overlap" analysis, however, it is irrelevant that the FDA has acknowledged the *possibility* that generic Precedex® may be used for the procedural indication in an ICU setting since all references to the protected ICU use code have been carved out of the proposed label.  The FDA is not obligated to consider how the product

*might* be used by physicians beyond the approved labeling.  *See, e.g.*, *Sigma-Tau Pharms., Inc. v. Schwetz*, 288 F.3d 141, 146-48 (4th Cir. 2002) (rejecting as "profoundly anti-competitive" the argument that if there is "foreseeable off-label use" FDA must "bar the approval of generic drugs, even for unprotected indications"); *see also Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493 , 1496, 1500 (D.C. Cir. 1996).  Instead, the law requires a focus only on the label.  Because the ANDA's *label* does not disclose the protected Intensive Care Unit Sedation use, the FDA reasonably concluded that authorization to approve the ANDAs section viii statements was appropriate.  The Court cannot find that the FDA's decision was "arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 476 U.S. at 844-5.  Accordingly, the Court will uphold the FDA's interpretation of section viii under *Chevron* step two and will therefore deny Hospira's motion for summary judgment as to Count I.

### B.    Count II- Violation of APA Rulemaking Requirements

In the alternative, Hospira argues that the FDA's August 18, 2014 decision was unlawful insofar as it amounted to a new "rule" as defined by the APA that was not adopted in accordance with the APA's notice and comment rulemaking requirements.  *See* 5 U.S.C. § 702.  However, as discussed at great length *supra* Section III.A.2, the FDA's August 18, 2014 decision to authorize the approval of a section viii ANDA whose carved out label omits explicit reference to a protected method of use, despite the fact that, in practice, the generic drug *might* be used for a protected use, was entirely consistent with the FDA's past practice.  As stated, the FDA has an established history of approving section viii ANDAs for broad, general indications even though they may, as here, partially overlap with a protected method of use where all express references to the protected use were carved out of the generic's label was not a new rule.  Indeed, this is exactly the practice the FDA followed in its handling of the approval of generic repaglinide,

generic tramadol, and generic oxandrolone.  Accordingly, the Court finds that the FDA's August 18, 2014 was entirely consistent with the FDA's established practice of approving ANDA's and therefore did not effect a change to settled law.  As such, no new "rule" was created by the FDA's decision and the FDA was therefore not required to follow the formal rulemaking procedures required by the APA when the FDA promulgates a new rule.  Hospira's motion for summary judgment is therefore denied as to Count II.

**IV.   Conclusion**

For the foregoing reasons, the Court will DENY Plaintiff Hospira's Motion for Summary Judgment, ECF No. 93; DENY Plaintiff Hospira's Motion for Preliminary Injunction, ECF No. 2; and GRANT the Motions for Summary Judgment filed by Defendants Food and Drug Administration, Sylvia Mathews Burwell, and Dr. Margaret Hamburg, ECF No. 92; Defendant-Intervenor Mylan, ECF No. 94, and Defendant-Intervenor Par Sterile's, ECF No. 96.


Dated: <u>September 5, 2014</u>                          <u>           /S/                               </u>
                                                                            George Jarrod Hazel
                                                                            United States District Judge